**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JFURTI, LLC and JACOB FRYDMAN, Derivatively on Behalf of All Similarly Situated Limited Partners and Shareholders in the Name and Right of FIRST CAPITAL REAL ESTATE TRUST INCORPORATED and FIRST CAPITAL REAL ESTATE OPERATING PARTNERSHIP, L.P., <br><br> Plaintiffs, <br><br> -against- <br><br> SUNEET SINGAL; FRANK GRANT; RICHARD LEIDER; FIRST CAPITAL REAL ESTATE ADVISORS, LP; FIRST CAPITAL REAL ESTATE INVESTMENTS, LLC; PRESIDENTIAL REALTY CORPORATION; PRESIDENTIAL REALTY OPERATING PARTNERSHIP; PHOTOMEDEX, INC; DOWNEY BRAND LLP; FORUM PARTNERS INVESTMENT MANAGEMENT, LLC; RUSSELL C. PLATT; and FORUM GLOBAL FINANCE SCSp, <br><br> Defendants, <br><br> and <br><br> FIRST CAPITAL REAL ESTATE TRUST INCORPORATED and FIRST CAPITAL REAL ESTATE OPERATING PARTNERSHIP, L.P., <br><br> Nominal Defendants. | Civil Action No. <br><br><br><br><br><br> **VERIFIED COMPLAINT** <br><br> Jury Trial Demanded |

Plaintiffs JFURTI, LLC ("JFURTI") and Jacob Frydman ("Frydman") bring this lawsuit

derivatively in the right of, on behalf of, and for the benefit of First Capital Real Estate Trust

Incorporated ("First Capital REIT" or the "REIT") and First Capital Real Estate Operating

Partnership, L.P. ("First Capital OP" or "the Operating Partnership") for violations of federal

securities laws and state law causes of action that have caused damage to the REIT, in which JFURTI and Frydman own stock, and to the Operating Partnership, which is substantially owned and controlled by the REIT.  The lawsuit is brought against:

- (i) Defendants Suneet Singal ("Singal"), Frank Grant ("Grant"), Richard Leider ("Leider"), First Capital Real Estate Investments, LLC ("FCREI"), and First Capital Real Estate Advisors, LP ("First Capital Advisors," and together with Singal, Grant, Leider, and FCREI, the "FC Defendants");

- (ii) Defendants Forum Partners Investment Management, LLC ("Forum"), Russell C. Platt ("Platt"), and Forum Global Finance SCSp ("Forum Global," and together with Forum and Platt, the "Forum Defendants");

- (iii) Defendants Presidential Realty Corporation ("Presidential REIT") and Presidential Realty Operating Partnership ("Presidential OP," and together with Presidential REIT, the "Presidential Defendants");

- (iv) Defendant PhotoMedex, Inc. ("PhotoMedex");

- (v) Downey Brand LLP ("Downey Brand" or "Downey," and collectively with the FC Defendants, Forum Defendants, Presidential Defendants, and PhotoMedex referred to herein as "Defendants," and each as a "Defendant"); and

- (vi) nominal Defendants First Capital REIT and First Capital OP.

JFURTI and Frydman served written demands on the Board of Directors of the Operating Partnership and the REIT, informing them of the allegations described herein and requesting that they take legal action to recover damages and obtain relief enumerated in this Complaint.  (Exs.

A, B, and C).  These demand letters have gone unanswered, necessitating the filing of this action to remedy the harms described herein.[1]

## Nature of Action

1.      This is an action against a serial fraudster, Defendant Suneet Singal, the companies controlled by him, and the individuals and companies that have participated alongside him in perpetrating the fraudulent conduct described herein.  The instant action seeks remedies for the series of securities law frauds and other wrongful conduct described below that Singal and the other Defendants have perpetrated against the REIT and the Operating Partnership.

2.      Singal and FCREI initially defrauded the REIT and Operating Partnership by inducing them to enter into a transaction on the basis of intentional misrepresentations as to the value of certain assets that Singal and FCREI agreed to deliver to the REIT in exchange for controlling shares of the REIT and Operating Partnership.  Among other things, Singal and FCREI falsely misrepresented in written representations and warranties the value and bona fides of certain hotels being contributed to the REIT, including by fraudulently representing that no proceeding or order had been threatened under any bankruptcy or insolvency law that could reasonably be expected to adversely affect the performance of Singal and FCREI under the governing transaction documents.  Singal and FCREI knew these representations were false when making them.  These deliberate and material misrepresentations induced the REIT and the Operating Partnership to issue shares to Singal and FCREI in exchange for assets – the aforementioned certain hotels – that were significantly overvalued and had been petitioned into bankruptcy proceedings prior to the OP's issuance of shares to Singal and FCREI, despite their

---

[1] The First Amended Complaint filed by Frydman and JFURTI in a prior action was dismissed for lack of adequate derivative demand.  *JFurti, LLC v. Forum Partners Inv. Mgmt.*, 16-cv-08633-CM (S.D.N.Y. Apr. 27, 2017).  Subsequent demands, dated May 24, 2017 and referenced above, cured the deficiencies cited by the District Court with respect to earlier demands.

misrepresentations to the contrary.  Defendant Downey Brand colluded with Singal and FCREI to make certain of the false representations regarding these assets.

3.     Once they had acquired control of the REIT and Operating Partnership, Singal, FCREI, and First Capital Advisors raised, between September 15, 2015 and February 28, 2016, more than $17 million in funds through a public offering of common stock of First Capital REIT. Upon information and belief, this money has been converted, dissipated and/or wasted by Singal, FCREI, and First Capital Advisors.  According to individuals in the offices of the REIT, the REIT is no longer in possession of such funds, and the location and the use of such funds has not been disclosed or accounted for to the employees or to shareholders of the REIT.

4.     On April 20, 2016, the SEC announced that its Division of Enforcement was conducting an investigation of the REIT, and issued a subpoena to the REIT for documents relating to the REIT's suspicious conduct.  At the time, the REIT already was delinquent in filing audited financials.  Despite the SEC's scrutiny, Singal and other Defendants were not dissuaded from engaging in an ongoing pattern of defrauding the REIT and Operating Partnership.  Singal and other Defendants caused the REIT and the Operating Partnership to engage in a series of sham transactions, whereby the REIT and the Operating Partnership transferred assets to Singal-controlled entities on the basis of deliberately false representations about what the REIT and Operating Partnership were receiving in return.

5.     Through carefully sequenced misrepresentations, diversions, dissipations and sham transactions, Singal and other Defendants fraudulently extracted and siphoned away over $100 million in assets from the REIT and the Operating Partnership for little or no consideration. They typically did this by misrepresenting to the REIT and Operating Partnership the value of securities that the REIT or Operating Partnership would be receiving from other entities in

exchange for the REIT's and/or the Operating Partnership's acquisition of shares of those other entities.  These sham transactions not only negatively impacted the value of the REIT and Operating Partnership, but also created liability for the REIT and the Operating Partnership by rendering them unable to pay debts as they became due, thereby exposing the REIT and Operating Partnership to unnecessary and costly litigations.

6.      In an example of one such transaction, in summer and fall 2016, Singal, through his role as CEO and director of the REIT, and in conjunction and in concert with the Forum Defendants, caused the REIT and the Operating Partnership to enter into an agreement to trade valuable REIT assets valued at over $37 million to Presidential OP – a newly formed company – and Presidential REIT – an insolvent shell company whose stock had been hovering in value at around a dime per share at the time of the transaction – in exchange for shares of Presidential OP that were effectively worthless.  *See* First Capital REIT, 8-K, July 18, 2016.  This transaction stripped the REIT of those assets – which were then "substantially all of its asserts, and those of its subsidiaries" – but left its liabilities untouched.  Singal and the Forum Defendants knowingly misrepresented to the REIT and First Capital OP the value of the assets that the REIT and the Operating Partnership would be receiving in this transaction and failed to explain to the REIT and First Capital OP that the true purpose of the transaction was to strip the REIT and the Operating Partnership of substantially all of their assets while leaving its liabilities untouched, thus deceiving the REIT and the Operating Partnership into transferring valuable assets to Presidential OP and Presidential REIT – entities Singal, the FC Defendants and the Forum Defendants intended to own and control – without getting fair value in exchange.

7.      In another example, on or about March 31, 2017, Singal, the Forum Defendants, and the other FC Defendants had the REIT and the Operating Partnership enter into another

interest contribution agreement with a company called PhotoMedex, Inc. (the "PhotoMedex Agreement"). Pursuant to the PhotoMedex Agreement, First Capital REIT agreed to transfer $30 million in real estate assets belonging to the REIT and the Operating Partnership, and in return accepted common and preferred stock in PhotoMedex. At the time of the transaction, PhotoMedex's common stock par value was $.01 per share (PhotoMedex, Schedule 13-D, April 2017) and total value altogether was less than $4 million. In fact, PhotoMedex's stockholder equity for the period ending September 30, 2016 had fallen below the Nasdaq Capital Market minimum requirement of $2.5 million, resulting in PhotoMedex's inability to comply with requirements to remain listed on the Nasdaq Capital Market under Nasdaq Marketplace Rule 5550(b)(1). Through the PhotoMedex Agreement, Singal, the Forum Defendants, and the other FC Defendants substantially transferred, or caused to be substantially transferred, the REIT's assets to an entity they would own and control, while leaving its liabilities untouched. PhotoMedex, Singal, the Forum Defendants (directly or through PhotoMedex, Singal or the other FC Defendants), and the other FC Defendants knowingly misrepresented to the REIT and the Operating Partnership the value of what they would be receiving from PhotoMedex in this transaction, and failed to explain to the REIT and the Operating Partnership that the true purpose of the PhotoMedex transaction was to further strip the REIT and Operating Partnership of its assets while leaving its liabilities untouched, thus deceiving the REIT and the Operating Partnership into transferring valuable assets to PhotoMedex without getting fair value in exchange.

8.      In addition to defrauding the REIT and the Operating Partnership of their assets and diverting and wasting away their resources, Singal, the other FC Defendants, and the Forum

Defendants have taken, or have failed to take, the following crucial actions on behalf of the REIT and Operating Partnership since acquiring control of them and their affiliated entities, including:

(a)     Failing to file *any* SEC-required quarterly financial statements or reports;

(b)     Failing to file *any* SEC-required annual audited financial statements;

(c)     Publishing a net asset value ("NAV") per share of REIT stock as $16.03 per share, up from $12.49, without providing adequate public disclosure to support this increased valuation in an effort to conceal their active dissipation of the REIT's assets;

(d)     Causing the REIT to default on several mortgage loans or preferred equity financings in its portfolio, including losing title to several mortgaged properties for non-satisfaction of liens, encumbrances, and real property taxes;

(e)     Failing to pay the REIT's employees on designated pay days in violation of N.Y. Lab. L. § 191, thereby unnecessarily subjecting the REIT to lawsuits seeking liquidated damages before ultimately firing many employees in June 2017; and

(f)      Terminating the REIT's independent auditors and independent board members, with a revolving door of CFOs parading through its offices – 3 CFOs in less than 2 years, each leaving for undisclosed reasons.

9.     As a result of Defendants' conduct, this lawsuit has been filed on behalf of the REIT and the Operating Partnership to, among other things:  (a) recover compensatory damages for the REIT and Operating Partnership caused by Defendants' securities fraud, breaches of fiduciary duty, and other wrongful and actionable conduct, (b) recover punitive damages and attorneys' fees for the REIT and the Operating Partnership, (c) to enjoin as a fraudulent conveyance the $800,000 payment to Presidential REIT and the sale or disposition of assets of

First Capital REIT and those of its subsidiaries to Defendant Presidential REIT, and (d) enjoin First Capital REIT from transferring additional assets to PhotoMedex.

## Jurisdiction and Venue

10.     The claims asserted herein arise under and pursuant to Section 10(b) of the Securities and Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78a et seq. (1934) and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

11.     This Court has jurisdiction over this securities fraud action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. §§ 1331 and 1337.  This Court has jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(a) because state law claims asserted herein are so related to the claims arising under the laws of the United States that they form part of the same case or controversy.

12.     Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391 as Defendants maintain offices in this district and/or the acts and conduct complained of herein occurred in substantial part in this district.  Venue is also proper pursuant to 28 U.S.C. § 1391 because all Defendants are subject to personal jurisdiction in this district and there is no district in which the action may otherwise be brought

13.     This Court has personal jurisdiction over Defendants (a) because they maintain offices and do business in New York and their written agreements with Plaintiffs provide for jurisdiction in the State and Federal courts of New York; (b) pursuant to New York CPLR 301 and 302(a)(1) for doing business and transacting business within the State; (c) pursuant to CPLR 302(a)(3)(ii) for commission of tortious acts without the State causing injury to person or property within the state; and/or (d) because they are co-conspirators in a wrongful scheme that

involved fraudulent transferring of funds and other assets in New York and that directly affects Plaintiffs in New York.

<u>**Plaintiffs' Derivative Standing and Demand on Defendants**</u>

14.     JFURTI is a shareholder of the REIT and owns REIT common stock.[2]  Frydman is a shareholder of the REIT and owns 47,680 shares of REIT common stock.  Plaintiffs JFURTI and Frydman, at all relevant times, have owned shares of REIT common stock.

15.     The Operating Partnership is a substantially owned and fully controlled subsidiary of the REIT.

16.     JFURTI and Frydman will adequately and fairly represent the interests of the REIT and Operating Partnership and all their stakeholders in enforcing and prosecuting the REIT's and the Operating Partnership's rights.

17.     JFURTI and Frydman have made a written demand to investigate and remedy the violations of law described herein as required by Federal Rule of Civil Procedure Rule 23.1, and Maryland and Delaware law.  Specifically, on May 24, 2017, Frydman and JFURTI served written demands on the Operating Partnership as General Partner of First Capital REIT and the directors of First Capital REIT informing them of the allegations described herein and requesting that they take legal action to recover damages and obtain the relief sought in this Complaint. (Exs. A, B, C).

18.     In earlier demands (and again repeated in their May 24, 2017 demands), Plaintiffs had set forth, in substantial part, the allegations contained herein and demanded (i) inspection of First Capital REIT's books and records and (ii) that any and all contemplated transactions to

---

[2]     JFURTI obtained a pledge of units of the Operating Partnership and therefore had the right to convert the pledged units into shares of REIT stock in certain circumstances.  JFURTI gave notice of the conversion, and notwithstanding a disagreement over the correct conversion rate, is an owner of REIT stock.

divest the Operating Partnership of any assets be immediately halted and a full investigation be initiated by an independent investigatory body.

19.    Neither the Operating Partnership nor any of First Capital REIT's directors or attorneys answered Plaintiffs' demand letters and they have wrongfully ignored and effectively refused Plaintiffs' demands without providing any reason at all.  Their wrongful decision to ignore and refuse Plaintiffs' demands is unfounded in law, was not made independently, and was not based on a good faith and reasonable investigation of the claims made in Plaintiffs' demands. The individual FC Defendants named in this Complaint breached their fiduciary duty to inform themselves of all material information reasonably available before determining to ignore and refuse Plaintiffs' demands, and their decision was not in the best interests of the REIT or Operating Partnership.  Indeed, their failure to respond to Plaintiffs' demands operates as tacit approval of Plaintiffs' right to proceed with this derivative action.

20.    The delay in acting upon Plaintiffs' demands already has caused irreparable harm to the REIT and Operating Partnership.  Singal and other Defendants continue to cause the REIT and Operating Partnership to enter into new transactions to divest the companies of their assets, and divert those assets to other entities owned and controlled by Singal, the FC Defendants and the Forum Defendants, for their benefit and the benefit of their affiliated entities, and to the detriment of the REIT and the Operating Partnership.

21.    Moreover, First Capital REIT's board of directors has been hand-picked by Singal at all times, currently and at all other times relevant to this Action.  All or a majority of such board members are interested in the fraudulent transactions referenced herein and their decision to not respond to a demand to initiate this Action was not made in good faith and does not represent a sound exercise of the business judgment rule.

### The Parties

22.    Plaintiff JFURTI is a Delaware limited liability company with a principal place of business at 46 Ledgerock Lane, Hyde Park, New York.

23.    Plaintiff Frydman is a resident of the State of New York, and the principal of JFURTI.

24.    Together, JFURTI and Frydman own and/or possess in excess of 25% of all issued and outstanding shares of common stock of the REIT.

25.    Upon information and belief, Defendant Forum is a Delaware limited liability company, with an office at 1700 East Putnam Avenue, Suite 205, Old Greenwich, Connecticut.

26.    Upon information and belief, Defendant Platt is a United States citizen, residing in London, UK, with a residence in the state of Connecticut and an office at 1700 East Putnam Avenue, Suite 205, Old Greenwich, Connecticut.  Upon information and belief, Platt serves as the Chief Executive Officer and Managing Director of Forum.

27.    Upon information and belief, Defendant Forum Global Finance SCSp is a partnership organized under the laws of the Grand Duchy of Luxembourg, and an affiliated company of Forum, with an office at 1700 East Putnam Avenue, Suite 205, Old Greenwich, Connecticut.

28.    Upon information and belief, Defendant Grant was appointed as a director of First Capital REIT on November 11, 2016.

29.    Upon information and belief, Defendant Leider was appointed as a director of First Capital REIT on November 11, 2016.

30.    Upon information and belief, Defendant Presidential REIT is a Real Estate Investment Trust with a principal place of business at 1430 Broadway, Suite 503, New York,

New York.  According to its public disclosures, Presidential REIT is engaged principally in the ownership of income-producing real estate, and currently owns one property in Massachusetts.

31.     Upon information and belief, Presidential OP is a Delaware limited partnership recently formed for the purpose of carrying out the scheme alleged herein.

32.     Upon information and belief, PhotoMedex is a Nevada corporation with its principal place of business located at 2300 Computer Drive, Building G, Willow Grove, Pennsylvania 19090.   According to its latest filing with the Nevada Secretary of State, PhotoMedex has a capital amount of $580,000 and a par share value of $0.01.

33.     Upon information and belief, Defendant Singal is a resident of the State of New York and is directly or indirectly the majority owner, and the Chief Executive Officer and Chairman, of all of the FC Private Entities,[3] including FCREI, and of First Capital Advisors. Singal also currently serves as the Chief Executive Officer, Chairman of the Board of Directors, Treasurer, and Secretary of First Capital REIT, with fiduciary obligations to First Capital REIT arising out of those positions.

34.     Upon information and belief, Defendant First Capital Advisors (formerly known as United Realty Advisors, LP) is a Delaware limited partnership with a principal place of business at 410 Park Avenue, 14th Floor, New York, New York.  Pursuant to a written advisory agreement (the "Advisory Agreement") with the REIT that cannot be terminated without payment of a substantial fee, First Capital Advisors conducts the operations and manages (directly, or through its management company affiliates) the property portfolio of REIT and all of its assets.  First Capital Advisors is the exclusive external advisor to the REIT, and thereby

---

[3] Along with FCREI and Singal, the FC Private Entities are (1) First Capital Re Fund 1 LLC; (2) First Capital Management Company LLC; (3) First Capital Management, LLC; (4) First Capital Retail, LLC; (5) First Capital Partners, LLC; and (6) First Capital Builders, LLC.

controls and manages First Capital REIT's properties and assets.  Upon information and belief, Forum substantially acquired First Capital Advisors in or around June 2016.

35.     Upon information and belief, Defendant FCREI is a California limited liability company with a principal place of business at 410 Park Avenue, 14th Floor, New York, New York, and is the private holding company through which Singal indirectly owns and/or controls First Capital Advisors and its affiliates.  Upon information and belief, Singal is the CEO and controlling party of FCREI.   Since June 2016, upon information and belief, the Forum Defendants, and in particular Platt, have controlled FCREI through a pledge and collateral assignment of its assets and those of Singal and First Capital Advisors.

36.     Upon information and belief, Defendant Downey Brand is a law firm with offices in California and Nevada that made certain representations described herein.

37.     Plaintiffs are shareholders of Nominal Defendant First Capital REIT (formerly known as United Realty Trust Incorporated), a publicly registered Real Estate Investment Trust organized in Maryland with a principal place of business at 410 Park Avenue, 14th Floor, New York, New York.  First Capital REIT owns substantially all of Nominal Defendant First Capital OP, a Delaware limited partnership with its principal place of business at 410 Park Avenue, 14th Floor, New York, New York, and exercises total control over the operations of First Capital OP.  First Capital OP owns and controls the special holding companies that hold First Capital REIT's real estate assets.  First Capital Advisors (not First Capital REIT itself) employs all of First Capital REIT's management team, and makes all decisions for First Capital REIT, is in control of all of First Capital REIT's properties and assets, is solely authorized to act on behalf of First Capital REIT, and is compensated by payment of a laundry list of fees from which it pays its employees and handsomely compensates its equity owners.

## FACTS

38.     First Capital REIT was formerly known as United Realty Trust Incorporated ("United REIT").  It was founded and owned by Jacob Frydman and JFURTI, until on or about September 15, 2015.

### A.     The Initial Securities Fraud

39.     On or about September 14, 2015, Singal, FCREI, and six other Singal-affiliated FC Private Entities entered into a Master Agreement (Ex. D) with various related United Realty entities and Frydman,[4] among others, pursuant to which Singal, FCREI, and the other FC Private Entities acquired ownership interests in United REIT and the other affiliated companies that controlled and operated United REIT.  These United Realty entities were rebranded as First Capital entities, with United REIT becoming First Capital REIT and United Realty Capital Operating Partnership LP becoming the First Capital OP.  By virtue of this transaction, Singal, FCREI, and the other FC Private Entities acquired control over the REIT.[5]

40.     As consideration for receiving units of the REIT and Operating Partnership and control of their affiliated entities, Singal, FCREI, and the FC Private Entities agreed, among other things, to contribute assets to the REIT and the Operating Partnership.

41.     Pursuant to an Asset Contribution Agreement (Ex. E), to which the Operating Partnership was a party, Singal, FCREI, and the other FC Private Entities were to contribute a specific portfolio of securities, deeds and contract rights worth $175 million to the Operating

---

[4]  The United Realty entities are as follows: (1) United Realty Advisors, LP; (2) United Realty Advisor Holdings, LLC; (3) URA Property Management LLC; (4) URTI GP, LLC; and (5) URTI LP, LLC.

[5]  Because Singal and the other FC Defendants defaulted on their payment obligations to Frydman and JFURTI, the initial transaction was re-negotiated twice, and ultimately was the subject of a Settlement Agreement dated June 2, 2016.  When Singal and the other FC Defendants defaulted on the Settlement Agreement also, Frydman and JFURTI brought an action in New York Supreme Court to collect payment.  That action still is pending, but is not materially related to this case.

Partnership, which assumed the debt associated with those assets, in exchange for Operating Partnership units.

42.     The REIT and the Operating Partnership's valuation were based on those contributions.

43.     The real estate assets being transferred were each owned by a special purposes entity or limited liability company.  Two such limited liability companies were RREAF O&G PORTFOLIO #2 LLC ("RREAF 2") and RREAF O&G PORTFOLIO #3 LLC ("RREAF 3"), which were wholly owned by FCREI (directly or through affiliates).

44.     RREAF 2 owned seven hotels in Texas and New Mexico.  RREAF 3 owned one hotel in Texas (the eight hotels owned by RREAF 2 and RREAF 3 are collectively referred to herein as the "Houston Hotels.")

45.     RREAF 2 and RREAF 3 were petitioned into bankruptcy on or about July 8, 2015.

46.     FCREI, as 100% owner of RREAF 2 and RREAF 3, knew that the companies were in bankruptcy but did not disclose the bankruptcy in the Master Agreement, the Asset Contribution Agreement, or any other agreement between the parties.

47.     Upon information and belief, based on public filings, Singal and FCREI (and the other FC Private Entities) knew or should have known that RREAF 2 and RREAF 3 were in bankruptcy, but failed to disclose the bankruptcy in the Master Agreement, Asset Contribution Agreement or any other agreement between the parties.  *See* First Capital REIT, 8-K, Sept. 21, 2015.

48.     Nor did RREAF 2, RREAF 3, FCREI or any other FC Entity seek relief from the automatic stay provision of the bankruptcy code before the FC Entities purported to convey the Houston Hotels owned by RREAF 2 and RREAF 3 to the REIT and OP.

49.     Indeed, Singal and FCREI (and the other FC Private Entities) knowingly employed devices, schemes, and artifices and omissions to defraud, made untrue statements of material fact and/or omitted to state material facts, and engaged in acts, practices and a course of business, which operated as a fraud and deceit upon the REIT and Operating Partnership, in connection with the Master Agreement, including the false material inducements that:[6]

(a)     the FC Private Entities are the owners of the UPREIT Assets, or have the right to acquire 100% of the ownership interests in each of the UPREIT Assets, and will convey to First Capital REIT at Closing good and marketable title to the UPREIT Assets owned by the FC Private Entities free from all claims, liens and encumbrances except only the Permitted Exceptions;[7]

- This representation was knowingly false when made, as the FC Private Entities knew that the Houston Hotels were the subject of bankruptcy proceedings, and therefore title to those properties was not being transferred free from all claims, liens and encumbrances; nor was the transferred title "good and marketable."

(b)     there are no proceedings at law or in equity before any court, grand jury, administrative agency or other investigative agency, bureau or instrumentality of any kind pending or, to the best of Buyer's knowledge, threatened, against or affecting the UPREIT Assets;

---

[6] Each of which were made at Section 5.10 of the Master Agreement, and then incorporated by reference in the Asset Contribution Agreement, which also contains additional similar representations.
[7] Capitalized terms not defined in this factual subsection shall have the meaning ascribed to them in the Master Agreement and the Asset Contribution Agreement.

- This representation was knowingly false when made, as RREAF 2 and RREAF 3 had been petitioned into bankruptcy in the United States Bankruptcy Court for the Western District of Texas (Midland) on or about July 8, 2015, mere months before this representation was made.

(c)     FC Private Entities' performance under the Master Agreement and the Asset Contribution Agreement are within their powers and have been duly authorized by all requisite actions, and the FC Private Entities obtained, or at Closing shall have obtained, all approvals required to be obtained to consummate all of the transactions contemplated in those agreements, and are the legal, valid and binding obligation of the FC Private Entities enforceable in accordance with their terms;

- This representation was knowingly false when made, as the FC Private Entities knew that the Houston Hotels were the subject of bankruptcy proceedings, no relief from the automatic stay had been obtained, and therefore the conveyance of the 8 properties at issue was not duly authorized.

(d)     no consent, authorization, license, permit, registration or approval, or exemption or other action by any third parties or governmental or public bodies, commissions or authorities are required in connection with the execution, delivery and performance by FC Private Entities of the Master Agreement and the Asset Contribution Agreement;

- This representation was knowingly false when made, as the FC Private Entities knew that the Houston Hotels were the subject of bankruptcy proceedings, no relief from the automatic stay had been obtained, and therefore the conveyance of the Houston Hotels was not duly authorized.

(e)      none of the UPREIT Assets or the land or improvements comprising or relating to the UPREIT Assets is in the hands of a receiver nor is an application for the appointment of a receiver pending; nor was there any petition in bankruptcy pending at the time of said transfer;

- This representation was knowingly false when made, as the bankruptcy filings of RREAF 2 and RREAF 3 clearly constituted bankruptcies relating to the UPREIT Assets.

(f)      the debt obligations secured by, or which are the obligation of the persons that hold title to the UPREIT Assets are current and not in default, that the FC Private Entities have not received any notice of default with respect to any of said debt, and the FC Private Entities have the right either contractually or based on its existing relationships, to cause holders of the minority interests in the UPREIT Assets, which are not owned by the FC Private Entities, to contribute their interests to the Operating Partnership (or a taxable REIT subsidiary) in connection with the UPREIT Transaction and are disclosed on Schedule 1, simultaneously with or prior to the closing in exchange for OP Units, and the FC Private Entities shall cause all such minority interests to be contributed to the Operating Partnership as part of the UPREIT Transaction.

- This representation was knowingly false when made, as RREAF 2 and RREAF 3 were in bankruptcy at that time, and therefore their debt obligations were not current and were indeed in default.

(g)      all information and documents delivered by the FC Private Entities to the seller parties relating to the UPREIT Assets are, to the actual, current knowledge of the FC Private Entities, true, complete and accurate in all material respects, and with respect to documents, are true, correct and complete copies thereof;

- This representation was knowingly false when made, for all the reasons set forth above in this Paragraph 49.

50.    Singal and FCREI (and the other FC Private Entities) employed devices, schemes, and artifices and omissions to defraud, made untrue statements of material fact and/or omitted to state material facts, and engaged in acts, practices and a course of business, which operated as a fraud and deceit upon the REIT and Operating Partnership, in connection with the Asset Contribution Agreement, including the false material inducements that:

(a)    Section 3.1 - Each Contributor has all requisite power and authority to execute, deliver and perform its obligations under this Agreement and any other Transaction Documents.  Each Contributor (other than the Contributors that are natural persons) has taken all necessary action to authorize the execution, delivery and performance of this Agreement and any other Transaction Documents.

- This representation was knowingly false when made.  As stated above, each Contributor did not have the requisite power and authority to execute, deliver and perform its obligations under the Transaction Documents and each Contributor did not own its respective Contributed Assets free and clear of all Liens except for the Permitted Exceptions.

(b)    Section 3.2 - Each Contributor owns its respective Contributed Assets free and clear of all Liens, except for the Permitted Exceptions.  […]  Upon delivery to the Operating Partnership on the Closing Date of each Contributor's respective Contributed Assets as contemplated by the Asset Contribution Agreement, such Contributor will thereby transfer to the Operating Partnership good and marketable title to such Contributed Assets, free and clear of all Liens, except for the Permitted Exceptions.  Except with respect to the JV Entities and the

Ground Lessor Property, by acquiring the Contributed Assets, the Operating Partnership will acquire, directly or indirectly, or, with respect to the Under Contract Properties, will receive the right to acquire a 100% fee simple interest in each of the Properties as well as the underlying Real Properties, Improvements and Other Property Rights.

- This representation was knowingly false when made in several respects.  First, as stated above, all the issued and outstanding Contributed Interests were not in fact duly authorized and validly issued; second, there existed liabilities other than the Permitted Liens that were not reflected on the balance sheet provided to the Operating Partnership by the Contributors and those liabilities were not satisfied at the Closing; third, each Contributor did not in fact transfer "good and marketable" title to the OP; and fourth, nearly all of the Houston Hotels were owned, in part, by entities or persons who were not parties to any of the Transaction Documents.  Even though the Asset Contribution Agreement claims that each Contributor owned 100% of the interest in each asset being conveyed, a subsequent SEC filing revealed that in fact FCREI, through RREAF 2 and RREAF 3, owned only 65% of seven of the eight Houston Hotels (one was owned 100%).  *See* First Capital REIT, 8-K, Sept. 21, 2015.

(c)     Section 3.4 - (i) All Affiliated Purchase Contracts have been duly and validly authorized by the parties to such Affiliated Purchase Contracts; (ii) All Affiliated Purchase Contracts are in full force and effect; (iii) No monetary or material non-monetary default (beyond applicable notice and cure periods) by any party exists under any Affiliated Purchase Contract;

- This representation was knowingly false when made.  Not all Affiliated Purchase Contracts have been duly and validly authorized by the parties to such Affiliated

Purchase Contracts, and not all of the Affiliated Purchase Contracts are in full force and effect.   There were monetary or material non-monetary defaults (beyond applicable notice and cure periods) under Affiliated Purchase Contracts. Furthermore, counterparties under any Affiliated Purchase Contracts that were then the subject of any voluntary or involuntary bankruptcy or insolvency proceedings, and consummation of the transactions contemplated did conflict with, result in a breach of the terms, conditions or provisions of, or constitute a default, an event of default or an event creating rights of acceleration, termination or cancellation or a loss of rights under, or result in the creation or imposition of any Lien upon such Contributor's Contributed Assets.

(d)      Section 3.8 - each Contributor has been solvent at all times prior to and will remain solvent for no less than 180 days following, the transfer of the Contributed Assets to the Operating Partnership.

- This representation was knowingly false when made because certain of the Contributors were not solvent at all times prior to and did not remain solvent for no less than 180 days following, the transfer of the Contributed Assets to the Operating Partnership.

(e)      Section 3.9 - except as otherwise disclosed in writing by Contributor, no Proceeding or Order is pending against or affecting any Contributor or any of its Affiliates (and, to the knowledge of such Contributor, no such Proceeding or Order has been threatened in writing):  (a) under any bankruptcy or insolvency Law; (b) that seeks or could be reasonably likely to seek injunctive or other relief in connection with this Agreement, any of the other Transaction Documents or the transactions contemplated hereby or thereby; or (c) that

reasonably could be expected to adversely affect . . . the performance by such Contributor under the Asset Contribution Agreement or any other Transaction Document.

- This representation was knowingly false when made because there were bankruptcy proceedings pending against the affiliates of certain Contributors, which should have been but were not disclosed, and which did, upon information and belief, adversely affect the performance of certain Contributors under the Asset Contribution Agreement and other Transaction Documents.

   (f)    Section 3.10 - except as shall have been satisfied on or prior to the Closing Date through the Required Consents and Approvals having been obtained or otherwise, no consent, waiver, approval or authorization of, or filing with, any Person or Governmental Authority or under any applicable Laws is required to be obtained by any Contributor in connection with the execution, delivery and performance of the Asset Contribution Agreement and the transactions contemplated therein, except for those consents, waivers, approvals, authorizations or filings, the failure of which to obtain or to file would not have a Material Adverse Effect.

- This representation was knowingly false when made, as the FC Private Entities knew that the Houston Hotels were the subject of bankruptcy proceedings, no relief from the automatic stay had been obtained, and therefore the conveyance of the Houston Hotels was not duly authorized.

   (g)    Section 3.11 - except as would not have a Material Adverse Effect, (a) all Tax Returns and reports required to be filed with respect to the Contributed Assets or by any Contributed Entity (including the JV Contributed Entities) have been timely filed (after giving effect to any filing extension properly granted by a Governmental Authority having authority to

22

do so) and all such Tax Returns and reports are accurate and complete in all material respects, and all Taxes required to be paid with respect to the Contributed Assets or by any Contributed Entity (including the JV Contributed Entities) have been timely paid in full whether or not shown to be due and payable on such Tax Returns, (b) no deficiencies for any Taxes have been proposed, or assessed with respect to the Contributed Assets or any Contributed Entity, and (c) the Contributed Entities (including the JV Contributed Entities) have complied with all applicable Laws and agreements relating to the payment and withholding of Taxes and have, within the time and in the manner prescribed by applicable Laws and agreements, withheld and paid over to the proper Governmental Authority all amounts required to have been withheld and paid in connection with amounts paid or owing to any past or present employee, independent contractor, creditor, member, consultant or other third party.   No waivers of the statutes of limitation are in effect in respect of any Taxes and none of the Contributed Entities (including the JV Contributed Entities) has agreed to any extension of time with respect to a Tax assessment or deficiency.   There are no Liens for Taxes (other than Permitted Liens) upon any of the Contributed Assets.   Each Contributed Entity (including the JV Contributed Entities) and any other entity in which a Contributed Entity (including the JV Contributed Entities) owns an equity interest has been at all times since its formation treated as other than an association taxable as a corporation for U.S. federal income tax purposes.

- This representation was knowingly false when made because All Tax Returns and reports were not properly or timely filed, were not accurate and complete in all material respects, and all Taxes required to be paid with respect to the Contributed Assets or by any Contributed Entity (including the JV Contributed Entities) were not timely paid in full.

(h)    Section 3.17 - except as set forth on Schedule 3.17, ( a) all leases (including the ground lease related to the Ground Leased Property), licenses, subleases, tenancies, possession agreements, occupancy agreements with tenants, subtenants or licensees, Franchise Agreements, property management agreements, television and internet service contracts, loans or other financing agreements related to the Properties (including without limitation agreements related to the Assumed Debt and all Other Property Rights) and all other contracts material to the operations of the Properties (the "Operating Contracts") are in full force and effect, (b) no monetary or material non-monetary default (beyond applicable notice and cure periods) by any party exists under any such Operating Contract, (c) there exists no event, occurrence, condition or act (including the transactions contemplated by this Agreement) that, with the giving of notice or the lapse of time or the happening of any further event or condition, would reasonably be expected to give rise to a default or breach by Contributors or, to the knowledge of the Contributors' Representative, any other party under any Operating Contract, and (d) no counterparty under any of such Operating Contract is presently the subject of any voluntary or involuntary bankruptcy or insolvency proceedings, except in each case as would not reasonably be expected to have a Material Adverse Effect.

- This representation was knowingly false when made because there existed monetary or material non-monetary defaults (beyond applicable notice and cure periods) under certain Operating Contracts, and there existed events, occurrences, conditions and/or acts that, with the giving of notice or the lapse of time or the happening of any further event or condition, would reasonably be expected to give rise to a default or breach by Contributors.

(i)     Section 3.18 - Schedule 3.18 sets forth (a) a true, complete and correct list of the Hotels and Gas Station that are subject to a Franchise Agreement, (b) the name and date of each Franchise Agreement and (c) any outstanding or incomplete capital expenditures or improvements planned or approved for any Hotel and required pursuant to the Franchise Agreement for such Hotel.  True, complete and correct copies of each Franchise Agreement and any outstanding so-called property improvement plans required to be completed for any Hotel have been delivered or made available to the Operating Partnership.

- This representation was knowingly false when made because there were outstanding or incomplete capital expenditures or improvements planned or approved for certain Hotel properties required pursuant to the Franchise Agreement for such Hotels that were not disclosed.

(j)     Section 3.24 - with respect to each Contributed Asset, the Contributors will provide, at or prior to Closing or promptly thereafter, audited financial statements, books, records and other financial information sufficient for URTI to timely prepare the audited financial statements and pro forma financial information required to be filed with the SEC by URTI pursuant to Regulation S-X under the Securities Act in connection with the transactions contemplated by this Agreement (the "S-X Financial Information").

- This representation was knowingly false when made.  The FC Private Entities did not intend to, and did not provide, at or prior to Closing or promptly thereafter, audited financial statements, books, records and other financial information sufficient for to the timely preparation of audited financial statements and pro forma financial information, as required to be filed with the SEC by the REIT pursuant to Regulation S-X under the Securities Act.

51.     Thus, the express representations and warranties made by Singal and FCREI (and the other FC Private Entities) to the REIT and Operating Partnership were false, and Singal and FCREI (and the other FC Private Entities) knew these statements were false on or about September 14, 2015 when they entered into the Master Agreement.

52.     A mere week after the FC Defendants executed the Master Agreement, in which they warranted that the UPREIT Assets were under no threat of proceedings at law or equity before any court or instrumentality of any kind, Singal, FCREI, and First Capital Advisors disclosed that as of July 8, 2015 – two months prior to the representations and warranties at issue – they had placed the Houston Hotels into voluntary Chapter 11 reorganization as a result of a maturity default with respect to approximately $42 million of mortgage debt secured by the Houston Hotels.  (First Capital REIT, 8-K, Sept. 21, 2015).

53.     As contemplated in the Master Agreement, the UPREIT Assets were "material" to the contemplated transaction.  Additionally, a $42 million mortgage debt with a maturity default was not a Permitted Exception under the Master Agreement.

54.     Singal and FCREI (and the other FC Private Entities), at the time the Master Agreement was executed, knew that $44,231,351 of Houston Hotel Debt was and had been outstanding and had suffered a maturity default (First Capital REIT, 8-K, Sept. 21, 2015) and nonetheless failed to disclose this information.

55.     Upon information and belief, Singal and FCREI (and the other FC Private Entities) made knowingly false representations and concealed the truth about the Houston Hotels portfolio in order to induce the REIT and Operating Partnership to enter into the transaction for the sale of the United Realty portfolio to Singal, FCREIT, and the other entities noted above.

Had the truth about the Houston Hotels and other material misrepresentations been known, the transaction would not have occurred, or would have been valued very differently.

56.     Not only did Singal and FCREI (and the other FC Private Entities) materially misrepresent the facts with respect to the Houston Hotels, but after the Houston Hotels were voluntarily placed into Chapter 11 reorganization, upon information and belief, based on conversations between Singal and Frydman, the FC Defendants transferred the Houston Hotels out of the First Capital REIT and the Operating Partnership portfolio entirely, without any consideration.

57.     Upon information and belief, based on conversations between Singal and Frydman, those assets were transferred directly out of First Capital REIT and the Operating Partnership and into the sole ownership and control of Singal and other Defendants.

58.     The ultimate transfer out of the REIT without adequate consideration of a significant amount of the UPREIT Assets that Singal, FCREI, and the other entities noted above were required to contribute to First Capital REIT and the Operating Partnership pursuant to the Master Agreement also constitutes waste and misappropriation.

59.     In addition to Singal and FCREI's (and the other FC Private Entities') conduct, Downey also contributed to the devaluation of First Capital REIT's assets and participated in the fraud perpetrated upon the REIT and Operating Partnership.

60.     Downey agreed, by letter dated September 15, 2015 (Ex. F), to take eight (8) deeds specifically contemplated in the Master Agreement, as escrow agent on behalf of the REIT, and undertook to "cause each of the deeds to be filed of record in the appropriate recording offices for [the REIT's] benefit not later than the close of business Monday, September 21, 2015."

61.     Upon information and belief, based upon the facts set forth in the following paragraph, Downey knew at the time it made the representations in the letter agreement that the deeds could not be recorded until tax liens and other debts against the properties, which had not been disclosed and had actively been concealed as set forth above, were paid and various title issues were resolved.   Upon information and belief, based upon the facts set forth in the following paragraph, Downey also knew that the liens, encumbrances and other clouds on title would not be cleared up by September 21, 2015, but nevertheless knowingly and/or recklessly represented that it would record the deeds.  Upon information and belief, based upon the facts set forth in the following paragraph, Downey did so because an honest disclosure that the deeds could not be recorded would have caused the transaction to fail to close.

62.     Upon information and belief, based upon the following facts, Downey knew these representations were false at the time they were made and acted with conscious behavior and recklessness in making these misrepresentations.   Downey knew facts or had access to information suggesting that their statements were not accurate, and failed to check information they had a duty to monitor.  Downey had been Singal's and his companies' counsel and knew that there were liens, tax issues and other clouds on title that had to be cleaned up before the deeds could be recorded.  They failed in the first instance to disclose those clouds on title. They had a duty to the REIT and the Operating Partnership to speak when they undertook to record deeds that were, at that point in time, unrecordable.

63.     Downey falsely stated that it would record the deeds by September 21, 2015, and failed to – ever – record the deeds in the name of the REIT.  Thus, the REIT and its shareholders were deprived of the value of those assets as of September 21, 2015, causing First Capital REIT and the Operating Partnership to have a lower value than they otherwise would have.  Downey's

false representations that the deeds would be recorded (and therefore, the pending liens and other debts would be satisfied) fraudulently induced the REIT and Operating Partnership, which relied on those representations, to enter into the transaction for the sale of the United Realty portfolio to Singal, FCREIT, and the other entities noted above.

**B.      The Fraudulent Dissipation of Publicly Raised Funds**

64.      After Singal, FCREI, and First Capital Advisors successfully gained control over First Capital REIT and the Operating Partnership, they began actively bilking First Capital REIT and the Operating Partnership.

65.      For example, as stated above, the Houston Hotels were transferred out of the Operating Partnership without consideration.  Also, between in or around September 15, 2015 and February 28, 2016, First Capital REIT, through an offering of common stock, raised approximately $17 million.

66.      Despite raising this significant amount of capital, officers and/or employees of First Capital REIT have informed Plaintiffs that First Capital REIT is no longer in possession of such funds.

67.      The location and disposition of the money raised has never been disclosed to shareholders.

68.      Furthermore, no financials have been filed, and therefore no disclosure made of the use of those funds.

69.      Upon information and belief, based on the absence of such disclosures, this money was not used to repay First Capital REIT's and the Operating Partnership's operating costs or numerous amassed creditors.

70.   Upon information and belief, based on the absence of such disclosures, all or part of the $17 million has been converted, dissipated and/or wasted by the Singal, FCREI, and First Capital Advisors.

**C.   Forum Acquires Control; And Another Fraudulent Transaction Is Consummated**

71.   FCREI announced that on or about on or about June 9, 2016, it had entered into an agreement with Forum, pursuant to which Forum, under Defendant Platt's leadership and control, had agreed to provide strategic advice to FCREI, including with respect to product development, capital raising and operational efficiency.   In connection with the strategic agreement, FCREI entered into two loan agreements with an affiliate of Forum for $15 million and $2.5 million respectively.   As a result of the transaction, Forum received 170,590.36 limited partnership units in the Operating Partnership and ultimately a lucrative interest in First Capital Advisors.   Since First Capital Advisors operates, manages and controls the REIT, Forum essentially obtained operational and management control over the REIT.

72.   Upon information and belief, based upon conversations between management personnel at First Capital Advisors and Frydman, the Forum Defendants embedded their own senior management personnel in the highest echelons of management of FCREI and First Capital Advisors, including in particular Malcolm Gllyn (CFO), Nimit Oberoi (CFA; VP First Capital Deal Runner), and Aaron Goldberg (lead outside counsel), and required that FCREI and First Capital Advisors seek approval from the Forum Defendants for virtually all material decisions, irrespective of whether such decisions relate to the Forum "loans" or not.   By virtue thereof, the Forum Defendants now control FCREI and First Capital Advisors, along with Singal.   The Forum Defendants are making material decisions on behalf of those entities, not for the benefit of First Capital REIT and its shareholders, or First Capital OP and its limited partners, but rather for the benefit of the Forum Defendants, Singal, Grant, and Leider.

73.     Upon information and belief, based on conversations between Singal and Frydman, the $15 and $2.5 million loans were made to facilitate Defendants Forum and Platt's takeover of First Capital Advisors, and to fund the Presidential REIT deal described below, each of which were designed to strip First Capital REIT and the Operating Partnership of valuable assets unencumbered by any corresponding liabilities.

74.     In furtherance of the objectives of Singal, FCREI, First Capital Advisors and the Forum Defendants to dissipate First Capital REIT's assets, on or around July 18, 2016, First Capital REIT, through Singal, entered into a letter of intent with Presidential REIT to sell what was then "substantially all of [First Capital REIT's] assets, and those of its subsidiaries" – which assets were valued around $37 million to Presidential REIT in exchange for Class B shares of limited voting stock of Presidential REIT by September 18, 2016.

75.     Notably, Presidential REIT has authorized two classes of shares, Class A shares and Class B shares.  Both Class A and B Presidential REIT shares have similar economic rights, but the Class A shares, which as a group represent just 16% of the total issued and outstanding Presidential REIT shares, have the right to elect 75% of the board of directors.  However, the Class B Shares, which as a group represent 84% of the total issued and outstanding Presidential REIT shares, only have the right to elect 25% of the board of directors. The Class A and Class B common stock trade in the over-the-counter market under the symbols PDNLA and PDNLB, respectively.

76.     Presidential REIT is an insolvent shell company whose stock had been hovering in value at around a dime per share.  Nonetheless, on July 18, 2016, First Capital REIT, through Singal, announced that it had entered into a letter of intent with Presidential REIT to sell "substantially all of its assets, and those of its subsidiaries," to Presidential REIT, for Class B

shares of limited voting stock of Presidential REIT.  (First Capital REIT, 8-K, July 18, 2016).

On that same date, Presidential REIT, in its own public filings, reported the proposed transaction,

which was a sham. (Presidential REIT, 8-K, July 18, 2016).

77.     Subsequently, under the direction of Singal, FCREI, First Capital Advisors and

the Forum Defendants, First Capital REIT and Presidential REIT entered into a Definitive

Agreement for an exchange of REIT properties and Presidential REIT stock (the "Definitive

Agreement").

78.     Pursuant to the Definitive Agreement, First Capital OP agreed to contribute to the

Presidential OP (i) 66% of its 92% ownership interests in Township Nine Owner LLC, which

indirectly owns the fee simple interest in 23 parcels of land located in Sacramento, California

(collectively, the "T9 Properties") and (ii) all of its 31.3% interest in Avalon Jubilee LLC, the

owner of real property consisting of 251, non-contiguous single-family, residential lots and a

10,000 square foot clubhouse, within the Jubilee at Los Lunas subdivision (the "Avalon

Property"), in exchange for 37,281,000 units of limited partnership interests in the Presidential

OP (each, a "Presidential OP Unit").

79.     The Presidential OP Units per the Definitive Agreement are convertible into

37,281,000 shares of unregistered Class B shares of Presidential (based upon a purchase price of

$37,281,000 and a valuation of $1.00 per Presidential OP Unit).

80.     At the time of the Definitive Agreement, the Class B stock of the insolvent shell

company Presidential REIT was trading at 10 cents per share.  The stated valuation of $1.00 per

unit price of Presidential OP stock is baseless and fraudulent, and was designed to conceal the

actual consideration in terms of Presidential OP securities the REIT and Operating Partnership

will receive in exchange for their transfer of valuable real property, which was far less than fair value.

81.    The Definitive Agreement separately provides that First Capital REIT will pay Presidential REIT $800,000 for operating capital and to pay expenses.

82.    One part of the transaction – the Avalon Transaction – closed on or about January 6, 2017.  The transaction, as discussed, is a sham, and the disclosures made by all transaction participants – the FC Defendants, the Forum Defendants and the Presidential Defendants – were fraudulent because they failed to disclose material information with regard to the lack of value received by the REIT in connection with the Avalon transaction and with respect to the REIT's acquisition of Presidential shares and mispresented to the REIT the value of what it was receiving.

83.    The net effect of the sale stripped First Capital REIT of valuable assets, revenues, and income streams in exchange for significantly overvalued Presidential OP units.  It also left the REIT insolvent and incapable of paying its obligations as they become due.

84.    Upon information and belief, based upon the facts set forth in the preceding paragraphs of this section C., the FC Defendants, the Forum Defendants and the Presidential Defendants conspired and planned to effectuate the sale in order to interfere with the rights of the REIT's stockholders, to avoid liabilities to the REIT's creditors, as a means to avoid publishing audited financial statements, and to provide a cover to justify the fraudulently inflated $16.03 share valuation for First Capital REIT's common stock.  This was never disclosed to the REIT.

85.    The second part of the Presidential transaction – involving transfer of the Township Nine Owner LLC property – has not yet closed.  Township Nine Owner LLC is in fact in voluntary bankruptcy following a mortgage default.  Despite that, Presidential has agreed to

attempt to close the deal in the future in order to effectuate another prong of this fraudulent transaction.

86.     Upon information and belief, based upon the facts set forth in the preceding paragraphs of this section C., Presidential REIT and Presidential OP knowingly participated in the fraud on First Capital REIT by consummating the sale, agreeing to purchase the assets of First Capital REIT and its subsidiaries once they shed their obligations to the REIT's creditors, to advance its own interests, and misrepresenting to the REIT the true value of what it was receiving.

87.     Moreover, the Forum Defendants also played a large part in consummating the sale for their own benefit, and to the detriment of the REIT.  Singal has admitted publicly that he and Forum and/or their respective affiliates intend to acquire the hyper-voting Presidential REIT Class A shares for themselves, and through the Class A Shares to exercise total control over Presidential REIT and its assets, under the Presidential brand, while leaving the First Capital REIT a shell.

88.     Singal, FCREI, and First Capital Advisors' failure to disclose First Capital REIT's financial position to its shareholders and creditors and file the requisite audited financial statements reflects the wrongful intent behind the Presidential transaction.

89.     Upon information and belief, based upon the facts set forth in the preceding paragraphs of this section C., one purpose of the sale, among other wrongful purposes, was to enable Singal, FCREI, and First Capital Advisors to avoid adequately disclosing the basis or methodology for valuing First Capital REIT's shares at $16.03 per share.  On July 15, 2016, First Capital REIT announced that it had revalued its share price, and issued NAV per share of First Capital REIT at $16.03 per share, up approximately 28% since the Master Agreement.  (First

Capital REIT, 8-K, July 18, 2016).  First Capital REIT has not adequately disclosed the basis or methodology for said valuation.  If Defendants are permitted to close the sale, shareholders of both First Capital REIT and Presidential REIT will have no other independent method to justify the $16.03 valuation.

90.    Upon information and belief, by virtue of the Presidential transaction, Singal, FCREI, and First Capital Advisors will be able to strip away the income of the First Capital entities that have the capacity to earn enough money to pay the obligations of the First Capital entities. These entities receive all or virtually all of their income from a laundry list of fees up to approximately $25 million per year, which are paid by First Capital REIT.  By "selling" valuable First Capital REIT assets to Presidential REIT, First Capital REIT will be left with no valuable assets and, therefore, the First Capital entities will be potentially stripped of all or virtually all of income-generating potential, and will be unable to meet any of their financial obligations.

91.    The sale advances Presidential REIT's interests at the expense of First Capital REIT and the Operating Partnership, as the sale would constitute a capital event of over $20 million, and Presidential REIT and its principals stand to benefit considerably.  Upon information and belief, based upon public filings by Presidential REIT, upon such a capital event, Presidential REIT principals will (i) collect deferred compensation of several hundred thousand dollars, (ii) collect substantial deferred bonuses, (iii) exercise 1,700 warrants, to acquire 1,700,000 shares of Presidential REIT at $00.10 per share, when the manifested value of each such share is $16.03 after the combination, and (iv) collect a "profit" of $27 million at the cost of the current First Capital REIT shareholders, including Plaintiffs, who will be diluted dollar-for-dollar up to the same $27 million as a result thereof.  Upon information and belief, based upon public filings by Presidential REIT, Presidential REIT only has two paid employees, but

Presidential REIT is unable to pay those employees their salaries because it is losing money annually and has no funds from which to pay the salaries. Upon information and belief, based upon public filings by Presidential REIT, last year, Presidential REIT cancelled approximately $425,000 in accrued and unpaid salary that it was unable to pay its employees, by issuing warrants giving one unpaid employee the right to purchase up to 1.7 million of Presidential REIT shares at $00.10 per share, which right could not be exercised until Presidential REIT had effected a capital transaction involving at least $20 million.  Thus, the sale, upon information and belief, based upon public filings by Presidential REIT, gives the employees the right to buy for just $170,000 (1.7 million x $00.10) a total of $27,251,000 of publicly traded shares (1.7 million x $16.03 stated price). If such shares are immediately sold, the employees would be significantly enriched, at a stiff dilution to the current First Capital shareholders of more than $27 million.

92.    Further, the sale gives Presidential REIT the right to acquire a portfolio of approximately $37 million of real estate assets for no consideration (other than printing some new stock certificates).  According to its own SEC filings, Presidential REIT is effectively valueless. According to a recently filed quarterly financial report, Presidential REIT was operating with a negative operating cash flow and reported a loss from operations.  Notably, the company reported a history of operating losses and working capital deficiencies, affecting their ability to meet obligations and continue as a going concern.  In fact, a review of Presidential REIT's recent financial statements suggests that Presidential REIT does not even have sufficient cash on hand to undertake a reasonable due diligence investigation of the true value of the assets of First Capital REIT.

93.    The sale allows diversion of fees paid to the First Capital entities to a new advisory entity, controlled by Presidential REIT.  Upon information and belief, based upon

public filings, Singal, the Forum Defendants, and/or their respective affiliates, have already acquired or are negotiating for the acquisition of a majority of Presidential REIT Class A shares (which effectively control the Presidential REIT as they have rights to elect 75% of the Presidential REIT board, while the Class B shares only have the right to elect 25% of the Presidential REIT board). This will allow them to control Presidential REIT, and to arrange for Presidential REIT to enter into a new advisory agreement with a new advisor and property manager in place of First Capital Advisors and FCREI.  In so doing, they will deprive the First Capital entities of the revenue needed to pay their obligations to their creditors.

94.     Lastly, as the CEO and Chairman of both First Capital Advisors and First Capital REIT, Singal is in a position to cause First Capital Advisors to voluntarily "waive" the substantial fees that First Capital REIT would otherwise be required to pay to First Capital Advisors should First Capital REIT terminate its agreement with First Capital Advisors.

**D.     The Sham PhotoMedex Transaction**

95.     Despite the pledge to transfer substantially all the REIT's assets to Presidential, Singal, the Forum Defendants, and the other FC Defendant also caused the REIT to enter into a sham transaction with PhotoMedex.

96.     On or about March 31, 2017, Singal, the Forum Defendants, and the other FC Defendants caused the REIT and the Operating Partnership to enter into the PhotoMedex Agreement with PhotoMedex, a struggling "Global Skin Health company" that had recently sold its "last significant business unit" – its consumer products division and related subsidiaries. (PhotoMedex, 10-Q, March 31, 2017).

97.     The PhotoMedex Agreement contemplated that First Capital REIT and the Operating Partnership would tender $30 million worth of assets to PhotoMedex, with the option

to contribute another $66.5 million <u>at their discretion</u>, all for a limited percentage of PhotoMedex stock.  In or around this time, PhotoMedex stock was valued around $1.77, and the cumulative value of the company was approximately $4 million dollars.  PhotoMedex at the time was struggling to remain listed on the Nasdaq Capital Market.  Upon information and belief, based on public filings, PhotoMedex was, for all intents and purposes, a shell company at the point of the transaction.

98.    In anticipation of entering into the PhotoMedex Agreement, PhotoMedex established a wholly owned subsidiary, FC Global Realty Operating Partnership, LLC ("FC Global").

99.    Upon information and belief, based on public filings, FC Global was established to effectuate PhotoMedex's transition from a struggling healthcare company to a real estate investment company (PhotoMedex, 10-Q, March 31, 2017), as well as to establish a new center of control through which Singal, the Forum Defendants, and the other FC Defendants could manage First Capital REIT's assets free and clear of its liabilities and shareholders.

100.    By transferring, or causing the transfer of, First Capital REIT and the OP's assets to PhotoMedex in exchange for limited PhotoMedex shares, Singal, the Forum Defendants, and the other FC Defendants effectively dissipated First Capital REIT and the OP's assets and diluted the value stakeholders had in those entities.

101.    Not only did the PhotoMedex Agreement act as an effective conduit for transferring First Capital REIT's valuable assets, but it also provided another avenue for Singal to personally benefit.

102.    As a result of the PhotoMedex Agreement, Singal became PhotoMedex's CEO –
complete with an additional compensation agreement and numerous undisclosed benefits – and a
position on PhotoMedex's board of directors.

103.    As of July 5, 2017, since Singal became CEO of PhotoMedex, PhotoMedex has
been delisted from the Nasdaq Capital Market for failing to file an initial listing application and
failing to satisfy the initial listing criteria upon completion of a change of control transaction.
(PhotoMedex, 8-K, July 5, 2017).

**E.      Additional Improper Dissipation of REIT and Operating Partnership Assets**

104.    The FC Defendants divested First Capital REIT and the Operating Partnership of
other valuable assets to create liquidity and transfer cash to other First Capital entities for their
own personal benefit and to escape First Capital REIT's liabilities.

105.    For example, on December 22, 2016, First Capital REIT, through its subsidiary
Tilden, finalized prerequisite conditions to sell property known as 2520 Tilden Avenue,
Brooklyn, New York pursuant to a purchase and sale agreement with a contract price of $31
million.  Upon information and belief, based on a review of wire transfers, the proceeds from the
sale of this property were wired out of First Capital and used to satisfy obligations wholly
unrelated to First Capital REIT and the OP.

106.    Additionally, on or around November 23, 2016, First Capital REIT, through its
subsidiary 7 Carnegie Plaza Fee, LLC, finalized prerequisite conditions to sell property known as
Fox Rehabilitation Center located in Cherry Hill, New Jersey, pursuant to a purchase and sale
agreement dated October 26, 2016.  The property was sold for approximately $12 million.

107.    The FC Defendants engaged in these transactions for their own personal gain, and
to the detriment of First Capital REIT and the Operating Partnership.  Upon information and

belief, based on a review of wire transfers, the proceeds from the sale of this property were wired out of First Capital and used to satisfy obligations wholly unrelated to First Capital REIT and the OP.

108.    By liquidating First Capital REIT and the Operating Partnership's assets, and then transferring those assets to other entities free and clear of the REIT or Operating Partnership's liabilities, the FC Defendants effectively stripped the REIT and Operating Partnership of any value.  In doing so, the FC Defendants made it virtually impossible for the REIT or Operating Partnership to meet their current creditor obligations, thereby exposing the REIT and Operating Partnership to additional substantial liability.

109.    Moreover, upon information and belief, based on public filings, Singal and the FC Defendants' self-serving actions have caused at least four (4) of First Capital REIT's direct and indirect subsidiaries to file for bankruptcy, including Township Nine Owner LLC, Capitol Station Holdings LLC, Capitol Station Member LLC, and Capitol Station 65 LLC.

110.    Singal and the FC Defendants' conduct in actively diverting assets from First Capitol REIT, its direct and indirect subsidiaries, and the Operating Partnership is tantamount to waste and mismanagement.

**First Claim For Relief**
**Violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78(j)(b)**
**and Rule 10b-5, 17 C.F.R.  § 240.10b-5 against Defendants Singal and FCREI**

111.    Plaintiffs derivatively repeat and reallege each of the allegations set forth above as if fully set forth herein.

112.    Defendants Singal and FCREI, in connection with the Master Agreement and the Asset Contribution Agreement, which were integrated agreements, and the other agreements integrated therein, made untrue statements of material facts that were knowingly untrue at the

time they were made and were intended to induce – and did induce – the Operating Partnership to enter into those agreements on false pretenses and caused harm to the Operating Partnership and the REIT.  Pursuant to the Master Agreement, simultaneously with the Closing, the Buyer would contribute a portfolio of real estate assets and contract rights (including the Houston Hotels portfolio), with a market value of not less than $140 million, and debt of not more than $55 million; in exchange for which the OP would issue units equal to the value of Buyer's equity at an exchange ratio of $12.49 per OP Unit.

113.   Among the other misrepresentations alleged above, *see supra* at paragraph 49 and incorporated herein, Singal and FCREI (and the other FC Private Entities) intentionally made false written representations, warranties and covenants in the Master Agreement (incorporated by reference into the Asset Contribution Agreement, to which the Operating Partnership was a party, and which itself contained additional similar misrepresentations) with respect to the assets that Singal and  FCREI agreed to contribute to the REIT.  For example, one representation, warranty and covenant made by Singal and FCREI in the Master Agreement was that the FC Private Entities were the owners of the UPREIT Assets, or had the right to acquire 100% of the ownership interests in each of the UPREIT Assets, and would convey to First Capital REIT at Closing good and marketable title to the UPREIT Assets owned by the FC Private Entities free from all claims, liens and encumbrances except only the Permitted Exceptions.  This representation was knowingly false when made, as Singal and FCREI knew that the Houston Hotels were the subject of bankruptcy proceedings, and therefore title to those properties was not being transferred free from all claims, liens and encumbrances; nor was the transferred title "good and marketable."

114.    Similarly, as another example of a written representation, warranty, and covenant that induced the Operating Partnership to enter into the Asset Contribution Agreement and its integrated agreements (including the Master Agreement), Singal and FCREI represented that there were no proceedings at law or in equity before any court, grand jury, administrative agency or other investigative agency, bureau or instrumentality of any kind pending or, to the best of Buyer's knowledge, threatened, against or affecting the UPREIT Assets.   This representation was knowingly false when made, as certain of the assets to be transferred had been petitioned into bankruptcy in the United States Bankruptcy Court for the Western District of Texas (Midland) on or about July 8, 2015, mere months before this representation was made.

115.    Paragraph 50 above identifies numerous other false written representations made by Singal and FCREI that induced the Operating Partnership to enter into the Asset Contribution Agreement and its integrated agreements (including the Master Agreement) and that were knowingly false when made.

116.    Singal and FCREI had a duty to disclose to First Capital REIT and the Operating Partnership material information known to them because, inter alia, they made representations that gave rise to a duty to speak completely, accurately, and truthfully.   Singal and FCREI omitted to state material facts about the assets that were being contributed to the REIT that were necessary to make the statements that they had made about those assets, in light of the circumstances in which they were made, not misleading.

117.    Singal and FCREI acted with scienter because, *inter alia*, they had knowledge of the fact that the contributed assets previously had been petitioned into bankruptcy or acted with conscious recklessness in not knowing this was the case, contrary to their misrepresentations otherwise; a fact which they revealed in public filings soon after the Master Agreement, Asset

Contribution Agreement, and other agreements integrated therein were fully executed and irreversible.

118.    The REIT and the Operating Partnership reasonably relied upon the written warranties, misrepresentations and covenants made by Singal and FCREI to the REIT and the Operating Partnership.

119.    In reliance upon said warranties, misrepresentations, and covenants, the REIT and the Operating Partnership issued shares to Singal and FCREI in exchange for assets that were fraudulently overvalued and were forced into bankruptcy almost immediately as a result of their debt obligations.

120.    As a direct and proximate result of Defendants' fraudulent misrepresentations, First Capital REIT and the Operating Partnership have suffered substantial damages, including but not limited to issuing shares in exchange for the receipt of property at a value less than represented and/or with encumbrances greater than represented.

### Second Claim For Relief
### Violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78(j)(b)
### and Rule 10b-5, 17 C.F.R.  § 240.10b-5 against Defendant Downey Brand

121.    Plaintiffs derivatively repeat and reallege each of the allegations set forth above as if fully set forth herein.

122.    Downey Brand falsely represented that they would file 8 deeds in the appropriate recording offices.

123. Upon information and belief, based upon the following facts, Downey Brand knew these representations were false at the time they were made and acted with conscious behavior and recklessness in making these misrepresentations.  Downey Brand knew facts or had access to information suggesting that their statements were not accurate, and failed to check information they had a duty to monitor.  Downey Brand had been Singal's and his

companies' counsel and knew that there were liens, tax issues and other clouds on title that had to be cleaned up before the deeds could be recorded.  They failed in the first instance to disclose those clouds on title.  They had a duty to the REIT and OP to speak when they undertook to record deeds that were, at that point in time, unrecordable.

124.    Downey Brand's fraudulent misrepresentations induced the REIT and OP, which relied on those representations, to enter into the transaction for the sale of the United Realty portfolio to Singal and the FC Defendants and to issue shares to them.

125.    Downey's misrepresentations directly and proximately caused damages and harm to the REIT and the Operating Partnership, by causing them to have a lower assessed value than they otherwise should have.  Their false representations that the deeds would be recorded (and therefore, the pending liens and other debts would be satisfied) fraudulently induced the REIT and OP to enter into the transaction for the sale of the United Realty portfolio to Singal and the FC Defendants.

### Third Claim For Relief
### Violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78(j)(b) and Rule 10b-5, 17 C.F.R. § 240.10b-5 against Defendants Singal, FCREI, First Capital Advisors, the Forum Defendants, and the Presidential Defendants

126.    Plaintiffs derivatively repeat and reallege each of the allegations set forth above as if fully set forth herein.

127.    Signal, FCREI, First Capital Advisors, the Forum Defendants and the Presidential Defendants engaged in a fraudulent scheme and committed a fraudulent and deceptive act, practice and course of business by entering into an agreement to sell the REIT's assets to Presidential in exchange for the purchase of Presidential OP units, which were convertible into 37,281,000 shares of unregistered class B shares of Presidential (at a valuation of $1.00/unit).  In addition, the disclosures made by all transaction participants were fraudulent, including because

they fail to disclose material information to the public, including the REIT's shareholders with regard to the lack of value received by First Capital REIT in connection with the transaction.

128.    The transaction was inherently deceptive.    At the time of the Definitive Agreement, the Class B stock of the insolvent shell company Presidential REIT was trading at 10 cents per share.  The stated valuation of $1.00 per unit price of Presidential OP stock was baseless and fraudulent, and was designed to conceal the actual consideration in terms of Presidential OP securities the REIT and Operating Partnership would receive in exchange for their transfer of valuable real property, which was far less than fair value.

129.    Singal, FCREI, First Capital Advisors, the Forum Defendants and the Presidential Defendants orchestrated the sale (1) to interfere and avoid the liabilities owed by the REIT; (2) to avoid publishing audited financial statements; and (3) to provide a cover to justify the increased $16.03 share valuation for First Capital REIT's common stock.  The Presidential Defendants participated in the sale to obtain the $37 million in real estate for a fraction of its true value and to allow them to exercise warrants to acquire 1.7 million shares of Presidential REIT at $0.10/share "where the manifested value of each such share is $16.03 after the combination."

130.    There are many indicia of scienter in connection with the Presidential transaction. There is strong circumstantial evidence of conscious misbehavior or recklessness given the FC Defendants' failure to disclose the REIT's financial position to its shareholders and creditors and file the requisite audited financial statements.

131.    In addition, there was both motive and opportunity to commit this fraud.  The sale permitted the FC Defendants to avoid adequately disclosing the basis or methodology for valuing the REIT's shares at $16.03 per share.  On July 18, 2016, First Capital REIT announced in a public disclosure under Rule 8K of the Securities and Exchange Act of 1934, that it had revalued

its share price, and issued NAV per share of First Capital REIT at $16.03 per share, up approximately 28% since the Master Agreement. First Capital REIT has not adequately disclosed the basis or methodology for said valuation. And if Defendants are permitted to close the sale, shareholders of both First Capital REIT and Presidential REIT will have no other independent method to justify the $16.03 valuation. The sale, therefore, can clearly be utilized to "justify" the $16.03 per share valuation.

132.    In addition, the FC Defendants will be able to strip away the income of the First Capital entities that have the capacity to earn enough money to pay obligation of the First Capital entities. These entities receive all or virtually all of their income from the laundry list of fees (identified above), representing approximately $25 million per year, which are paid by First Capital REIT. By "selling" valuable First Capital REIT assets to Presidential REIT, First Capital REIT will be left with no valuable assets and, therefore, First Capital Advisors and FCREI will be potentially stripped of all or virtually all of their income and will be unable to meet any financial obligations on behalf of the REIT.

133.    Furthermore, the fraudulent transaction would constitute a capital event of over $20 million, and Presidential REIT and its principals stand to benefit considerably. Upon information and belief, based upon public filings by Presidential REIT, upon such a capital event, Presidential REIT principals will (i) collect deferred compensation of several hundred thousand dollars, (ii) collect substantial deferred bonuses, (iii) exercise, upon information and belief, 1,700 warrants, to acquire 1,700,000 shares of Presidential REIT at $00.10 per share, when the manifested value of each such share is $16.03 after the combination, and (iv) collect a "profit" of $27 million at the cost of the current First Capital REIT shareholders, including Plaintiffs, who will be diluted dollar-for-dollar up to the same $27 million as a result thereof.

Upon information and belief, based upon public filings by Presidential REIT, Presidential REIT only has two paid employees, but Presidential REIT is unable to pay those employees their salaries because it is losing money annually and has no funds from which to pay the salaries. Upon information and belief, based upon public filings by Presidential REIT, last year Presidential REIT cancelled approximately $425,000 in accrued and unpaid salary that it was unable to pay its employees, by issuing warrants giving one unpaid employee the right to purchase up to 1.7 million of Presidential REIT shares at $00.10 per share, which right could not be exercised until Presidential REIT had effected a capital transaction involving at least $20 million. Thus, the sale, upon information and belief, based upon public filings by Presidential REIT, gives the employees the right to buy for just $170,000 (1.7 million x $00.10) a total of $27,251,000 of publicly traded shares (1.7 million x $16.03 stated price). If such shares are immediately sold, the employees would be significantly enriched, at a stiff dilution to the current First Capital shareholders of more than $27 million.

134.    The sale also provides Presidential REIT the opportunity to acquire a portfolio of approximately $37 million of real estate assets for no consideration (other than printing some new stock certificates). According to its own SEC filings, Presidential REIT is broke.  According to its recently filed quarterly financial reports, Presidential REIT was operating with a negative operating cash flow and reported a loss from operations.  Notably, the company reported a history of operating losses and working capital deficiencies, affecting their ability to meet obligations and continue as a going concern.  In fact, a review of Presidential REIT's recent financial statements suggests that Presidential REIT does not even have sufficient cash on hand to undertake a reasonable due diligence investigation of the true value of the assets of First Capital REIT.

135.     The sale further allows diversion of fees paid to the First Capital entities to a new advisory entity, controlled by Presidential REIT. Upon information and belief, based upon conversations between Frydman and Singal and public filings, Singal, the Forum Defendants, and/or their respective affiliates, have already acquired or are negotiating for the acquisition of a majority of Presidential REIT Class A shares (which effectively control the Presidential REIT as they have rights to elect 75% of the Presidential REIT board, while the Class B shares only have the right to elect 25% of the Presidential REIT board). This will allow them to control Presidential REIT, and to arrange for Presidential REIT to enter into a new advisory agreement with a new advisor and property manager in place of First Capital Advisor and FCREI.  In so doing, they will deprive the First Capital Advisors and FCREI of the revenue needed to pay any obligations to the REIT creditors, thereby subjecting the REIT to unnecessary and costly litigation.

136.     As the CEO and Chairman of both First Capital Advisors and First Capital REIT, Singal is in a position to cause First Capital Advisors to voluntarily "waive" the substantial fees that First Capital REIT would otherwise be required to pay to First Capital Advisors should First Capital REIT terminate its agreement with First Capital Advisors.  That would further deprive First Capital Advisors of the revenues, which Plaintiffs relied upon in restructuring, for a fourth time, the defaulted obligations of the FC Defendants and accepting First Capital Advisors as a guarantor.

137.     One part of the transaction – the Avalon Transaction – closed on or about January 6, 2017.  The transaction constitutes a fraudulent scheme and constitutes a fraudulent and deceptive act, practice, and course of business.  In addition, the disclosures made in connection with this transaction were fraudulent because they failed to disclose material information with

regard to the lack of value received by the REIT in connection with the transaction and with respect to the REIT's acquisition of Presidential shares and mispresented to the REIT the value of what it was receiving.

138.  The net effect of the sale stripped First Capital REIT of valuable assets, revenues, and income streams in exchange for significantly overvalued Presidential OP units.  Thus, the fraudulent transaction directly and proximately caused damages to the REIT and Operating Partnership.

139.  It also left the REIT insolvent and incapable of paying its obligations as they become due.  Upon information and belief, based upon the facts set forth in the preceding paragraphs of this Third Claim for Relief, the FC Defendants, the Forum Defendants and the Presidential Defendants effectuated the sale in order to interfere with the rights of the REIT's stockholders, to avoid liabilities to the REIT's creditors, as a means to avoid publishing audited financial statements, and to provide a cover to justify the fraudulently inflated $16.03 share valuation for First Capital REIT's common stock.  This material information was never disclosed to the non-colluding members of the REIT or the Operating Partnership.

**Fourth Claim For Relief**
**Violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78(j)(b)**
**and Rule 10b-5, 17 C.F.R.  § 240.10b-5 against Defendants Singal, FCREI, First Capital**
**Advisors, the other FC Defendants, the Forum Defendants, and the PhotoMedex**
**Defendants**

140.  Plaintiffs derivatively repeat and reallege each of the allegations set forth above as if fully set forth herein.

141.  In connection with this transaction, Singal, FCREI, First Capital Advisors, the other FC Defendants, and the PhotoMedex Defendants knowingly employed devices, schemes, and artifices and omissions to defraud, made untrue statements of material fact and/or omitted to

state material facts, and engaged in acts, practices and a course of business, which operated as a fraud and deceit upon the REIT and Operating Partnership

142.   On or about March 31, 2017, Singal, the Forum Defendants, and the other FC Defendants caused the REIT and the Operating Partnership to enter into the PhotoMedex Agreement with PhotoMedex, a struggling "Global Skin Health company" that had recently sold its "last significant business unit" – its consumer products division and related subsidiaries. (PhotoMedex, 10-Q, March 31, 2017). The PhotoMedex Agreement contemplated that First Capital REIT and the Operating Partnership would tender $30 million worth of assets to PhotoMedex, with the option to contribute another $66.5 million at their discretion, all for a limited percentage of PhotoMedex stock.  In or around this time, PhotoMedex stock was valued around $1.77, and the cumulative value of the company was approximately $4 million dollars. PhotoMedex at the time was struggling to remain listed on the Nasdaq Capital Market.  Upon information and belief, based on public filings, PhotoMedex was, for all intents and purposes, a shell company at the point of the transaction.  By transferring, or causing the transfer of, First Capital REIT and the OP's assets to PhotoMedex in exchange for the purchase of limited PhotoMedex shares, Singal, the Forum Defendants, and the other FC Defendants effectively dissipated First Capital REIT and the OP's assets and diluted the value stakeholders had in those entities.

143.   The participants in this self-dealing transaction failed to disclose to the REIT and the Operating Partnership that the REIT and the Operating Partnership were receiving PhotoMdex stock that was essentially worthless.  This was a willful and material omission given that the PhotoMedex Agreement contemplated that First Capital REIT and the Operating Partnership would tender $30 million worth of assets to PhotoMedex, with the option to

contribute another $66.5 million <u>at their discretion</u>, all for a limited percentage of PhotoMedex stock, which was effectively a worthless shell company at the time.  The REIT and the Operating Partnership suffered significant damages as a direct and proximate result of this fraudulent transaction.

144.    The parties to this transaction acted with scienter.  The PhotoMedex Agreement acted as an effective conduit for transferring First Capital REIT's valuable assets, but it also provided another avenue for Singal and the FC Defendants to personally benefit.  As a result of the PhotoMedex Agreement, Singal became PhotoMedex's CEO – complete with an additional compensation agreement and numerous undisclosed benefits – and a position on PhotoMedex's board of directors.  In addition, there was both motive and opportunity to commit this fraud because, *inter alia*, the sale, as with the Presidential transaction, permitted the FC Defendants to avoid adequately disclosing the basis or methodology for valuing the REIT's shares at $16.03 per share and can be utilized to further "justify" the $16.03 per share valuation.  The sale also provides PhotoMedex the opportunity to acquire a significant portfolio of real estate assets for no real consideration (other than printing some new stock certificates).

### Fifth Claim For Relief
### Breach of Fiduciary Duty Against the FC Defendants

145.    Plaintiffs derivatively repeat and reallege each of the allegations set forth above as if fully set forth herein.

146.    The FC Defendants collectively operate and control First Capital REIT and the Operating Partnership.

147.    The FC Defendants each owe First Capital REIT and the Operating Partnership fiduciary obligations, including the obligation of good faith, fair dealing, loyalty and due care. Moreover, each of the FC Defendants owes First Capital REIT and the Operating Partnership the

fiduciary duty to exercise good faith and diligence in the administration of the affairs of First

Capital REIT and First Capital OP and in the use and preservation of their property and assets.

148.    By way of example, Section 5 of the Advisory Agreement provides:

> **FIDUCIARY RELATIONSHIP**.  The Advisor, as a result of its
> relationship with the [First Capital REIT] and the Operating
> Partnership pursuant to this Agreement, stands in a contractual and
> fiduciary relationship with the Stockholders and the partners in the
> Operating Partnership.

149.    By engaging in the misconduct and mismanagement, the FC Defendants breached

their fiduciary duties to First Capital REIT and First Capital OP.

150.    Specifically, since the Master Agreement, (a) the FC Defendants failed to file

financial statements for First Capital REIT; (b) the FC Defendants represented to the public the

NAV per share of First Capital REIT without disclosing adequate details or methodology or

releasing any underlying appraisals; (c) the FC Defendants caused First Capital REIT to default

on six mortgages in First Capital REIT's portfolio, including losing title to one property for

nonpayment of property taxes; (d) Signal, FCREI and First Capital Advisers caused dissipation

and loss of the Hotel Portfolio; (e) the FC Defendants caused dissipation and loss of cash

obtained through stock sales; and (f) the FC Defendants borrowed a $15 million loan from the

Forum Defendants to facilitate the Presidential REIT and PhotoMedex deals.

151.    Additionally, by undertaking and approving the dissipation of assets, and the sale

to Presidential REIT and PhotoMedex, the FC Defendants disregarded sound business practices

and knowingly, intentionally, recklessly, and/or negligently breached their respective fiduciary

duties owed to First Capital REIT and the Operating Partnership.

152.    The sale to PhotoMedex constitutes a fraudulent conveyance.

153.    The sale and the wrongful dissipation and misuse of assets caused First Capital

REIT and the Operating Partnership to waste their assets and expend corporate funds improperly,

impairs their reputation and credibility for no legitimate business purpose, and results in stripping First Capital REIT and the Operating Partnership of their assets, revenues, and income streams.

154.    The sale and the dissipation of assets wrongfully advances the FC Defendants' own interests, and those of their partners in this scheme, the Forum Defendants, Presidential REIT, Presidential OP, and PhotoMedex.

155.    As a direct and proximate result of the FC Defendants' failure to perform properly their respective fiduciary obligations, First Capital REIT and the Operating Partnership have sustained significant damages.

156.    As a result of the misconduct alleged herein, the FC Defendants are liable to First Capital REIT and the Operating Partnership for their damages.

<div align="center">

**Sixth Claim For Relief**
**Aiding and Abetting of Breach of Fiduciary Duty**
**Against the Forum Defendants, the Presidential Defendants and the PhotoMedex**
**Defendants**

</div>

157.    Plaintiffs derivatively repeat and reallege each of the allegations set forth above as if fully set forth herein.

158.    As alleged above, the FC Defendants owe fiduciary duties to First Capital REIT and First Capital OP, which the FC Defendants breached.

159.    The Forum Defendants, the Presidential Defendants and the PhotoMedex had direct and substantial knowledge of the fiduciary duties owed by the FC Defendants to the First Capital REIT and the Operating Partnership.

160.    The Forum Defendants, the Presidential REIT, and Presidential OP substantially assisted and aided and abetted the FC Defendants in breaching their fiduciary duties.

161.    Upon information and belief, the Forum Defendants made a loan of approximately $15 million to the FC Defendants in late May or early June 2016, and took the controlling interests in the FC Defendants and/or related First Capital entities as collateral security for that loan.

162.    Upon information and belief, it has always been, and continues to be, the undisclosed plan of the Forum Defendants to use its loan to take control of the FC Defendants and/or related FC entities, and by virtue thereof, First Capital REIT.   The loan has been structured in a way that makes it highly likely that the FC Defendants and/or related FC entities will default and give rise to the Forum Defendants' right to foreclose on that collateral.

163.    Upon information and belief, since closing their loan with the FC Defendants, the Forum Defendants, acting beyond the scope of any reasonable lender, have imbedded their employees into senior management roles within the First Capital group of companies, all with the tacit permission and approval of the FC Defendants, and by virtue thereof, the FC Defendants have yielded their corporate authority to the Forum Defendants and wrongfully permitted the Forum Defendants to exercise (directly or indirectly) control over First Capital Advisor and by virtue thereof, First Capital REIT.

164.    As a result thereof, the Forum Defendants have enhanced and strengthened their control over the FC Defendants, and taken actions that most lenders would fear taking, as they may put themselves in a position of losing their status as a lender.   And by virtue thereof, the Forum Defendants have instructed the FC Defendants to take actions, fully knowing that such actions constitute breaches of the FC Defendants' fiduciary duties to First Capital REIT and First Capital OP.

165. Presidential REIT, Presidential OP and the Forum Defendants knowingly participated in consummating the sale, with full knowledge that the sale would result in a fraudulent conveyance. Presidential REIT, Presidential OP and the Forum Defendants knowingly participated in the dissipation of assets of First Capital REIT as well.

166. As a direct and proximate result of Forum Defendants, Presidential REIT, and Presidential OP's aiding and abetting breaches of fiduciary duty, First Capital REIT and First Capital OP suffered damages, as alleged herein.

167. As a result of the misconduct alleged herein, the Forum Defendants, Presidential REIT and Presidential OP are liable to First Capital REIT and First Capital OP for their damages.

### Seventh Claim For Relief
### Fraudulent Conveyance Pursuant to N.Y. Debtor & Creditor Law §§ 274-276 Against the FC Defendants, Presidential REIT, Presidential OP, and PhotoMedex

168. Plaintiffs derivatively repeat and reallege each of the allegations set forth above as if fully set forth herein.

169. The PhotoMedex transaction was made without fair consideration; the compensation received for the transaction was so inadequate that no person of ordinary, sound business judgment would deem it worth that which the corporation paid. In addition, the transaction left the REIT and the Operating Partnership with unreasonably small capital. Furthermore, the transaction stripped the REIT and the Operating Partnership of its capital, such that they could not subsequently pay their debts as they became due. Finally, the FC Defendants and PhotoMedex engaged in the Photomedex transaction with actual intent to hinder, delay or defraud the then-current and future creditors of the REIT and the Operating Partnership.

170.    By reason of the foregoing, Plaintiffs are entitled to set aside the PhotoMedex transaction and are entitled to attorneys' fees pursuant to NYDCL Sections 276 and 276-a.

171.    The Avalon Transaction was made without fair consideration; such compensation is so inadequate that no person of ordinary, sound business judgment would deem it worth that which the corporation will pay.   In addition, the transaction left the REIT and the Operating Partnership with unreasonably small capital.   Furthermore, the transaction stripped the REIT and the Operating Partnership of its capital, such that they could not subsequently pay their debts as they became due.   Finally, Presidential REIT and Presidential OP engaged in the Avalon Transaction with actual intent to hinder, delay or defraud the then-current and future creditors of the REIT and the Operating Partnership.

172.    By reason of the foregoing, Plaintiffs are entitled to set aside the Avalon Transaction and are entitled to attorneys' fees pursuant to NYDCL Sections 276 and 276-a.

### Eighth Claim For Relief
### To Enjoin the Sale of Assets to Presidential REIT and Presidential OP

173.    Plaintiffs derivatively repeat and reallege each of the allegations set forth above as if fully set forth herein.

174.    Through the sale detailed above, the FC Defendants have transferred or are in the process of transferring additional valuable assets from First Capital REIT and its subsidiaries to Presidential REIT and Presidential OP in such a manner as to strip the assets, revenues and income stream from First Capital REIT and the Operating Partnership in an effort avail themselves of First Capital REIT's assets without encumbrance from First Capital REIT's liabilities.

175.    These contemplated, and consummated, transactions provide no benefit for First Capital REIT and the Operating Partnership – only significant harm.

176.    Plaintiffs will be irreparably harmed by these transactions as they constitute fraudulent conveyances, and will result in First Capital REIT and the Operating Partnership being left with liabilities but no corresponding assets, thereby significantly devaluing the overall value of these entities.

177.    As alleged above, Plaintiffs are likely to succeed on the merits for all of the claims for relief alleged herein.

178.    The balance of the equities weighs in Plaintiffs' favor.

179.    Plaintiffs are entitled, *inter alia*, to enjoin the FC Defendants from disposing of the assets of First Capital REIT and/or set aside any conveyance or annul any obligation to make such a conveyance of assets.

180.    Plaintiffs have no adequate remedy at law.

181.    Accordingly, Plaintiffs seek relief in the form of a preliminary and permanent injunction.

**Ninth Claim For Relief**
**To Enjoin the Sale of Assets Pursuant to N.Y.  Debtor & Creditor Law § 279 and**
**applicable state law**

182.    Plaintiffs derivatively repeat and reallege each of the allegations set forth above as if fully set forth herein.

183.    Through the sale detailed above, the FC Defendants will transfer valuable assets from First Capital REIT and its subsidiaries to Presidential REIT and Presidential OP in such a manner as to strip the assets, revenues and income stream from First Capital REIT and First Capital OP, without receiving fair consideration in return.

184.    Plaintiffs will be irreparably harmed by the sale because it constitutes a fraudulent conveyance, and will result in First Capital REIT and First Capital OP being left without valuable assets.

185.    First Capital REIT and First Capital OP will be irreparably harmed by the sale.

186.    Under applicable New York law, including but not limited to Section 279 of the Debtor and Creditor Law, Plaintiffs are entitled, *inter alia*, to enjoin the FC Defendants from disposing of the assets of First Capital REIT and First Capital OP and/or set aside any conveyance or annul any obligation to make such a conveyance of assets.

187.    Plaintiffs have no adequate remedy at law.

188.    Accordingly, Plaintiffs seek relief in the form of a preliminary and permanent injunction.

## Tenth Claim For Relief
## Common Law Fraud against Defendants Singal and FCREI

189.    Plaintiffs derivatively repeat and reallege each of the allegations set forth above as if fully set forth herein.

190.    Defendants Singal and FCREI, in connection with the Master Agreement and the Asset Contribution Agreement, which were integrated agreements, and the other agreements integrated therein, made untrue statements of material facts that were knowingly untrue at the time they were made and were intended to induce – and did induce – the Operating Partnership to enter into those agreements on false pretenses and caused harm to the Operating Partnership and the REIT.  Pursuant to the Master Agreement, simultaneously with the Closing, the Buyer would contribute a portfolio of real estate assets and contract rights (including the Houston Hotels portfolio), with a market value of not less than $140 million, and debt of not more than $55 million; in exchange for which the OP would issue units equal to the value of Buyer's equity at an exchange ratio of $12.49 per OP Unit.

191.    Among the other misrepresentations alleged above, *see supra* at paragraph 49 and incorporated herein, Singal and FCREI (and the other FC Private Entities) intentionally made

false written representations, warranties and covenants in the Master Agreement (incorporated by reference into the Asset Contribution Agreement, to which the Operating Partnership was a party, and which itself contained additional similar misrepresentations) with respect to the assets that Singal and  FCREI agreed to contribute to the REIT.  For example, one representation, warranty and covenant made by Singal and FCREI in the Master Agreement was that the FC Private Entities were the owners of the UPREIT Assets, or had the right to acquire 100% of the ownership interests in each of the UPREIT Assets, and would convey to First Capital REIT at Closing good and marketable title to the UPREIT Assets owned by the FC Private Entities free from all claims, liens and encumbrances except only the Permitted Exceptions. This representation was knowingly false when made, as Singal and FCREI knew that the Houston Hotels were the subject of bankruptcy proceedings, and therefore title to those properties was not being transferred free from all claims, liens and encumbrances; nor was the transferred title "good and marketable."

192.    Similarly, as another example of a written representation, warranty, and covenant that induced the Operating Partnership to enter into the Asset Contribution Agreement and its integrated agreements (including the Master Agreement), Singal and FCREI represented  that there were no proceedings at law or in equity before any court, grand jury, administrative agency or other investigative agency, bureau or instrumentality of any kind pending or, to the best of Buyer's knowledge, threatened, against or affecting the UPREIT Assets.  This representation was knowingly false when made, as certain of the assets to be transferred had been petitioned into bankruptcy in the United States Bankruptcy Court for the Western District of Texas (Midland) on or about July 8, 2015, mere months before this representation was made.

193.    Paragraph 50 above identifies numerous other false written representations made by Singal and FCREI that induced the Operating Partnership to enter into the Asset Contribution Agreement and its integrated agreements (including the Master Agreement) and that were knowingly false when made.

194.    Singal and FCREI had a duty to disclose to First Capital REIT and the Operating Partnership material information known to them because, inter alia, they made representations that gave rise to a duty to speak completely, accurately, and truthfully.   Singal and FCREI omitted to state material facts about the assets that were being contributed to the REIT that were necessary to make the statements that they had made about those assets, in light of the circumstances in which they were made, not misleading.

195.    Singal and FCREI acted with scienter because, *inter alia*, they had knowledge of the fact that the contributed assets previously had been petitioned into bankruptcy or acted with conscious recklessness in not knowing this was the case, contrary to their misrepresentations otherwise; a fact which they revealed in public filings soon after the Master Agreement, Asset Contribution Agreement, and other agreements integrated therein were fully executed and irreversible.   Other indicators of scienter relating to Singal and FCREI's conduct are alleged in detail in paragraphs 117, 130, and 144 above and 208 and 222 below.

196.    The REIT and the Operating Partnership reasonably relied upon the written warranties, misrepresentations and covenants made by Singal and FCREI to the REIT and the Operating Partnership.

197.    In reliance upon said warranties, misrepresentations, and covenants, the REIT and the Operating Partnership issued shares to Singal and FCREI in exchange for assets that were

fraudulently overvalued and were forced into bankruptcy almost immediately as a result of their debt obligations.

198.    As a direct and proximate result of Defendants' fraudulent misrepresentations, First Capital REIT and the Operating Partnership have suffered substantial damages, including but not limited to issuing shares in exchange for the receipt of property at a value less than represented and/or with encumbrances greater than represented.

**Eleventh Claim For Relief**
**Common Law Fraud against Defendant Downey Brand**

199.    Plaintiffs derivatively repeat and reallege each of the allegations set forth above as if fully set forth herein.

200.    Downey Brand falsely represented that it would file 8 deeds in the appropriate recording offices by September 21, 2015.

201.    Upon information and belief, Downey Brand was aware that the deeds could not be recorded until certain liens, encumbrances and other clouds on title were cleared up.  Upon information and belief, Downey Brand also knew that the liens, encumbrances and other clouds on title would not be cleared up by September 21, 2015, but nevertheless knowingly and/or recklessly represented that it would record the deeds.  Upon information and belief, Downey Brand did so because an honest disclosure that the deeds could not be recorded would have caused the transaction to fail to close.

202.    The REIT and the OP relied on Downey Brand's fraudulent misrepresentations and were induced to enter into the transaction for the sale of the United Realty portfolio to Singal and the FC Defendants and to issue shares to them.

203.    Downey's misrepresentations directly and proximately caused harm to the REIT and the Operating Partnership by causing them to have a lower assessed value than they

otherwise should have.  Their false representations that the deeds would be recorded (and

therefore, the pending liens and other debts would be satisfied) fraudulently induced the REIT

and OP to enter into the transaction for the sale of the United Realty portfolio to Singal and the

FC Defendants.

<div align="center">

**Twelfth Claim For Relief**
**Common Law Fraud against Defendants Singal, FCREI,**
**First Capital Advisors, the Forum Defendants, and the Presidential Defendants**

</div>

204.    Plaintiffs derivatively repeat and reallege each of the allegations set forth above as

if fully set forth herein.

205.    Signal, FCREI, First Capital Advisors, the Forum Defendants and the Presidential

Defendants engaged in a fraudulent scheme and committed a fraudulent and deceptive act,

practice and course of business by entering into an agreement to sell the REIT's assets to

Presidential in exchange for the purchase of Presidential OP units, which were convertible into

37,281,000 shares of unregistered class B shares of Presidential (at a valuation of $1.00/unit).  In

addition, the disclosures made by all transaction participants were fraudulent, including because

they fail to disclose material information to the public, including the REIT's shareholders with

regard to the lack of value received by First Capital REIT in connection with the transaction.

206.    The transaction was inherently deceptive.  At the time of the Definitive

Agreement, the Class B stock of the insolvent shell company Presidential REIT was trading at 10

cents per share.  The stated valuation of $1.00 per unit price of Presidential OP stock was

baseless and fraudulent, and was designed to conceal the actual consideration in terms of

Presidential OP securities the REIT and Operating Partnership would receive in exchange for

their transfer of valuable real property, which was far less than fair value.

207.    Singal, FCREI, First Capital Advisors, the Forum Defendants and the Presidential

Defendants orchestrated the sale to interfere and avoid the liabilities owed by the REIT; (2)

avoid publishing audited financial statements; and (3) to provide a cover to justify the increased $16.03 share valuation for First Capital REIT's common stock.  The Presidential Defendants participated in the sale to obtain the $37 million in real estate for a fraction of its true value and to allow them to exercise warrants to acquire 1.7 million shares of Presidential REIT at $0.10/share "where the manifested value of each such share is $16.03 after the combination."

208.     There are many indicia of scienter in connection with the Presidential transaction. There is strong circumstantial evidence of conscious misbehavior or recklessness given the FC Defendants' failure to disclose the REIT's financial position to its shareholders and creditors and file the requisite audited financial statements.

209.     In addition, there was both motive and opportunity to commit this fraud.  The sale permitted the FC Defendants to avoid adequately disclosing the basis or methodology for valuing the REIT's shares at $16.03 per share.  On July 18, 2016, First Capital REIT announced in a public disclosure under Rule 8K of the Securities and Exchange Act of 1934, that it had revalued its share price, and issued NAV per share of First Capital REIT at $16.03 per share, up approximately 28% since the Master Agreement. First Capital REIT has not disclosed the methodology for said valuation. And if Defendants are permitted to close the sale, shareholders of both First Capital REIT and Presidential REIT will have no other independent method to justify the $16.03 valuation. The sale, therefore, can clearly be utilized to "justify" the $16.03 per share valuation.

210.     In addition, the FC Defendants will be able to strip away the income of the First Capital entities that have the capacity to earn enough money to pay obligation of the First Capital entities.  These entities receive all or virtually all of their income from the laundry list of fees (identified above), representing approximately $25 million per year, which are paid by First

Capital REIT. By "selling" valuable First Capital REIT assets to Presidential REIT, First Capital REIT will be left with no valuable assets and, therefore, First Capital Advisors and FCREI will be potentially stripped of all or virtually all of their income and will be unable to meet any financial obligations on behalf of the REIT.

211.    Furthermore, the fraudulent transaction would constitute a capital event of over $20 million, and Presidential REIT and its principals stand to benefit considerably. Upon information and belief, upon such a capital event, based upon public filings by Presidential REIT, Presidential REIT principals will (i) collect deferred compensation of several hundred thousand dollars, (ii) collect substantial deferred bonuses, (iii) exercise, upon information and belief, 1,700 warrants, to acquire 1,700,000 shares of Presidential REIT at $00.10 per share, when the manifested value of each such share is $16.03 after the combination, and (iv) collect a "profit" of $27 million at the cost of the current First Capital REIT shareholders, including Plaintiffs, who will be diluted dollar-for-dollar up to the same $27 million as a result thereof. Upon information and belief, based upon public filings by Presidential REIT, Presidential REIT only has two paid employees, but Presidential REIT is unable to pay those employees their salaries because it is losing money annually and has no funds from which to pay the salaries. Upon information and belief, based upon public filings by Presidential REIT, last year Presidential REIT cancelled approximately $425,000 in accrued and unpaid salary that it was unable to pay its employees, by issuing warrants giving one unpaid employee the right to purchase up to 1.7 million of Presidential REIT shares at $00.10 per share, which right could not be exercised until Presidential REIT had effected a capital transaction involving at least $20 million. Thus, the sale, upon information and belief, based upon public filings by Presidential REIT, gives the employees the right to buy for just $170,000 (1.7 million x $00.10) a total of

$27,251,000 of publicly traded shares (1.7 million x $16.03 stated price). If such shares are immediately sold, the employees would be significantly enriched, at a stiff dilution to the current First Capital shareholders of more than $27 million.

212.    The sale also provides Presidential REIT the opportunity to acquire a portfolio of approximately $37 million of real estate assets for no consideration (other than printing some new stock certificates). According to its own SEC filings, Presidential REIT is broke. According to its recently filed quarterly financial reports, Presidential REIT was operating with a negative operating cash flow and reported a loss from operations. Notably, the company reported a history of operating losses and working capital deficiencies, affecting their ability to meet obligations and continue as a going concern. In fact, a review of Presidential REIT's current financial statements suggests that Presidential REIT does not even have sufficient cash on hand to undertake a reasonable due diligence investigation of the true value of the assets of First Capital REIT.

213.    The sale further allows diversion of fees paid to the First Capital entities to a new advisory entity, controlled by Presidential REIT. Upon information and belief, based upon conversations between Frydman and Singal and public filings, Singal, the Forum Defendants, and/or their respective affiliates, have already acquired or are negotiating for the acquisition of a majority of Presidential REIT Class A shares (which effectively control the Presidential REIT as they have rights to elect 75% of the Presidential REIT board, while the Class B shares only have the right to elect 25% of the Presidential REIT board). This will allow them to control Presidential REIT, and to arrange for Presidential REIT to enter into a new advisory agreement with a new advisor and property manager in place of First Capital Advisor and FCREI. In so doing, they will deprive the First Capital Advisors and FCREI of the revenue needed to pay any

obligations to the REIT creditors, thereby subjecting the REIT to unnecessary and costly litigation.

214.     As the CEO and Chairman of both First Capital Advisors and First Capital REIT, Singal is in a position to cause First Capital Advisors to voluntarily "waive" the substantial fees that First Capital REIT would otherwise be required to pay to First Capital Advisors should First Capital REIT terminate its agreement with First Capital Advisors. That would further deprive First Capital Advisors of the revenues, which Plaintiffs relied upon in restructuring, for a fourth time, the defaulted obligations of the FC Defendants and accepting First Capital Advisor as a guarantor.

215.     One part of the transaction – the Avalon Transaction – closed on or about January 6, 2017.  The transaction constitutes a fraudulent scheme and constitutes a fraudulent and deceptive act, practice, and course of business.  In addition, the disclosures made in connection with this transaction were fraudulent because they failed to disclose material information with regard to the lack of value received by the REIT in connection with the transaction and with respect to the REIT's acquisition of Presidential shares and mispresented to the REIT the value of what it was receiving.

216.     The net effect of the sale stripped First Capital REIT of valuable assets, revenues, and income streams in exchange for significantly overvalued Presidential OP units.  Thus, the fraudulent transaction directly and proximately caused damages to the REIT and Operating Partnership.

217.     It also left the REIT insolvent and incapable of paying its obligations as they become due.  Upon information and belief, the FC Defendants, the Forum Defendants and the Presidential Defendants effectuated the sale in order to interfere with the rights of the REIT's

stockholders, to avoid liabilities to the REIT's creditors, as a means to avoid publishing audited financial statements, and to provide a cover to justify the fraudulently inflated $16.03 share valuation for First Capital REIT's common stock.  This material information was never disclosed to the non-colluding members of the REIT or the Operating Partnership.

### Thirteenth Claim For Relief
### Common Law Fraud against Defendants Singal, FCREI, First Capital Advisors, the other FC Defendants, the Forum Defendants, and the PhotoMedex Defendants

218.    Plaintiffs derivatively repeat and reallege each of the allegations set forth above as if fully set forth herein.

219.    In connection with this transaction, Singal, FCREI, First Capital Advisors, the other FC Defendants, and the PhotoMedex Defendants knowingly employed devices, schemes, and artifices and omissions to defraud, made untrue statements of material fact and/or omitted to state material facts, and engaged in acts, practices and a course of business, which operated as a fraud and deceit upon the REIT and Operating Partnership

220.    On or about March 31, 2017, Singal, the Forum Defendants, and the other FC Defendants caused the REIT and the Operating Partnership to enter into the PhotoMedex Agreement with PhotoMedex, a struggling "Global Skin Health company" that had recently sold its "last significant business unit" – its consumer products division and related subsidiaries. (PhotoMedex, 10-Q, March 31, 2017). The PhotoMedex Agreement contemplated that First Capital REIT and the Operating Partnership would tender $30 million worth of assets to PhotoMedex, with the option to contribute another $66.5 million at their discretion, all for a limited percentage of PhotoMedex stock.  In or around this time, PhotoMedex stock was valued around $1.77, and the cumulative value of the company was approximately $4 million dollars. PhotoMedex at the time was struggling to remain listed on the Nasdaq Capital Market.  Upon information and belief, based on public filings, PhotoMedex was, for all intents and purposes, a

shell company at the point of the transaction.  By transferring, or causing the transfer of, First Capital REIT and the OP's assets to PhotoMedex in exchange for the purchase of limited PhotoMedex shares, Singal, the Forum Defendants, and the other FC Defendants effectively dissipated First Capital REIT and the OP's assets and diluted the value stakeholders had in those entities.

221.    The participants in this self-dealing transaction failed to disclose to the REIT and the Operating Partnership that the REIT and the Operating Partnership were receiving PhotoMdex stock that was essentially worthless.  This was a willful and material omission given that the PhotoMedex Agreement contemplated that First Capital REIT and the Operating Partnership would tender $30 million worth of assets to PhotoMedex, with the option to contribute another $66.5 million at their discretion, all for a limited percentage of PhotoMedex stock, which was effectively a worthless shell company at the time.  The REIT and the Operating Partnership suffered significant damages as a direct and proximate result of this fraudulent transaction.

222.    The parties to this transaction acted with scienter.  The PhotoMedex Agreement acted as an effective conduit for transferring First Capital REIT's valuable assets, but it also provided another avenue for Singal and the FC Defendants to personally benefit.  As a result of the PhotoMedex Agreement, Singal became PhotoMedex's CEO – complete with an additional compensation agreement and numerous undisclosed benefits – and a position on PhotoMedex's board of directors.  In addition, there was both motive and opportunity to commit this fraud because, *inter alia*, the sale, as with the Presidential transaction, permitted the FC Defendants to avoid adequately disclosing the methodology for valuing the REIT's shares at $16.03 per share and can be utilized to further "justify" the $16.03 per share valuation.  The sale also provides

PhotoMedex the opportunity to acquire a significant portfolio of real estate assets for no real consideration (other than printing some new stock certificates).

**Fourteenth Claim For Relief**
**Conversion Against the FC Defendants**

223.    Plaintiffs derivatively repeat and reallege each of the allegations set forth above as if fully set forth herein.

224.    Through their mismanagement of First Capital REIT and the Operating Partnership, the FC Defendants have taken for their own benefit, and/or misused, cash assets belonging to First Capital REIT and the Operating Partnership, and in addition, have given over certain of those cash assets to the Forum Defendants.  In each instance, the consideration First Capital REIT and the Operating Partnership have received in exchange has been at best radically insufficient, so inadequate in value that no person of ordinary, sound business judgment would deem it worth that which was taken from the corporation.

225.    The action of FC Defendants is wrongful, and constitutes an unauthorized exercise of dominion over the property to the exclusion of its rightful owner First Capital REIT and First Capital OP, causing harm to First Capital REIT and First Capital OP.

226.    As a direct and proximate result of the FC Defendants' conversion and theft, First Capital REIT and First Capital OP have been, and will continue to be, damaged, in an amount to be proved at the trial on the merits.

**Fifteenth Claim For Relief**
**Aiding and Abetting Conversion Against the Forum Defendants**

227.    Plaintiffs derivatively repeat and reallege each of the allegations set forth above as if fully set forth herein.

228.    Through their mismanagement of First Capital REIT and First Capital OP, the FC Defendants have taken for their own benefit, and/or misused, cash assets belonging to First

Capital REIT and First Capital OP, and in addition, have given over certain of those cash assets to the Forum Defendants, for insufficient consideration which no person of ordinary, sound business judgment would deem worth the amount First Capital REIT paid.

229.    The Forum Defendants had direct and substantial knowledge of this wrongful conduct.

230.    The Forum Defendants, upon information and belief, directed this wrongful conduct.

231.    The Forum Defendants have taken and/or accepted as their own from the FC Defendants certain of the cash assets belonging to First Capital REIT and First Capital OP. Upon information and belief, they were aware that the consideration that FC REIT and FC OP received for these cash assets was insufficient.

232.    The action of Forum Defendants is wrongful, and constitutes an unauthorized exercise of dominion over the property to the exclusion of its rightful owners, First Capital REIT and First Capital OP, causing harm to FIRST Capital REIT and First Capital OP.

233.    As a direct and proximate result of Forum Defendants' aiding and abetting of the conversion and theft, First Capital REIT and First Capital OP have been, and will continue to be, damaged, in an amount to be proved at the trial on the merits.

**Sixteenth Claim For Relief**
**Waste Against the FC Defendants**

234.    Plaintiffs derivatively repeat and reallege each of the allegations set forth above as if fully set forth herein.

235.    The FC Defendants' unlawful conduct, including but not limited to misappropriation, conversion, and theft of assets belonging to First Capital REIT and First Capital OP, and their participation in fraudulent conveyances, including the (1) contemplated

sale to Presidential REIT (as to Defendants Singal, FCREI and First Capital Advisor); (2) consummated sale to PhotoMedex (as to all FC Defendants), and (3) 2520 Tilden Avenue and Fox Rehabilitation Center consummated sales, are unconscionable, irrational and so far opposed to the interests of First Capital REIT and First Capital OP, constitute waste and mismanagement of First Capital REIT's and First Capital OP's assets.  First Capital REIT and First Capital OP have been repeatedly deprived of their assets by the FC Defendants, either without receiving consideration or for consideration so minimal as to render it meaningless.  Regardless, what First Capital REIT and First Capital OP have received has been so inadequate in value that no person of ordinary, sound business judgment would deem it worth the loss of assets. Additionally, the FC Defendants' actions have left First Capital REIT susceptible to numerous unnecessary lawsuits, from publishing a NAV without any required corresponding disclosure information, failing to pay First Capital REIT's employees on the designated pay day, and upon information and belief firing numerous CFOs and accounting firms for attempting to address and rectify FC Defendants' fraudulent and illegal behavior.

236.    By reason of the foregoing, First Capital REIT and First Capital OP have been, and will continue to be, damaged and are entitled to a judgment against the FC Defendants in an amount to be determined at trial.

<u>**Seventeenth Claim For Relief**</u>
<u>**Aiding and Abetting Waste Against the Forum Defendants**</u>

237.    Plaintiffs derivatively repeat and reallege each of the allegations set forth above as if fully set forth herein.

238.    The Forum Defendants' unlawful conduct, including but not limited to their misappropriation, conversion and theft of assets belonging to First Capital REIT and First Capital OP, and their participation in fraudulent conveyances, including the contemplated sale to

Presidential REIT and consummated sale to PhotoMedex, all of which are unconscionable, irrational and so far opposed to the interests of First Capital REIT and First Capital OP, constitutes waste and mismanagement of First Capital REIT's and First Capital OP's assets. First Capital REIT and First Capital OP have been deprived of their assets by the Forum Defendants either without receiving consideration or with consideration so minimal as to render it meaningless.  Regardless, what First Capital REIT and First Capital OP have received has been so inadequate in value that no person of ordinary, sound business judgment would deem it worth the loss of assets.

239.    The Forum Defendants were aware of, participated in, and upon information and belief, directed for their own benefit, the wrongful conduct of the FC Defendants that constitutes waste and mismanagement.

240.    By reason of the foregoing, First Capital REIT and First Capital OP have been, and will continue to be, damaged and are entitled to a judgment against the Forum Defendants in an amount to be determined at trial.

**Eighteenth Claim For Relief**
**Accounting Against the FC Defendants**

241.    Plaintiffs derivatively repeat and reallege each of the allegations set forth above as if fully set forth herein.

242.    First Capital REIT has a confidential and/or fiduciary relationship with its shareholders.

243.    The FC Defendants have caused First Capital REIT to breach the duty imposed by the relationship respecting property in which the shareholders have an interest.

244.    The FC Defendants should provide an accounting to Plaintiffs in order to determine the financial condition of the REIT and the Operating Partnership, including but not

limited to (a) whether First Capital REIT had the ability to pay the mortgages on which it defaulted; (b) the amount, location, and use of all investments obtained during the September 15, 2015 - February 28, 2016 offering; (c) whether the FC Defendants transferred any additional money or assets to their affiliated entities or third parties which has not been previously disclosed to shareholders; and (d) any and all additional transactions between any of the FC Defendants or their affiliates on the one hand and any of the Forum Defendants or their affiliates, on the other hand.

<u>**Nineteenth Claim For Relief**</u>
<u>**Intentional Misrepresentation And Deceptive Trade Practices (Cal. Bus. & Prof. Code §**</u>
<u>**17200 *et seq.*) Against Downey Brand**</u>

245.    Plaintiffs derivatively repeat and reallege each of the allegations set forth above as if fully set forth herein.

246.    By virtue of its September 15, 2015 letter agreement, Downey made a clear and unequivocal representation that they would cause the eight (8) deeds in question to be recorded in the appropriate registers, seven (7) of which were to be recorded in California and the remaining one (1) to be recorded in Texas.

247.    Registering these deeds was crucial First Capital REIT claiming title to these proprieties, as well as accurately assess the value of First Capital REIT.

248.    Downey failed to record any of these deeds, and knew at the time it made the representation – without disclosing such knowledge – that it would be unable to register any of these deeds unless and until the properties were unencumbered by tax liens and other debts, and that the various title issues were resolved.   Downey, intentionally or with reckless disregard, failed to disclose this to Plaintiffs.

249.   Plaintiffs reasonably and foreseeably relied upon Downey's representation that it would record the eight (8) deeds in question in entering into the Master Agreement and the Asset Contribution Agreement.

250.   Downey's failure to record those eight (8) deeds deprived First Capital REIT of the value of those assets as of September 21, 2015, and caused First Capital REIT to have a lower assessed value than it otherwise should have.

251.   Plaintiffs' reliance on Downey's representation was a substantial factor in causing the harm suffered by Plaintiffs.

WHEREFORE, it is respectfully requested that this Court enter an Order:

a)   On the First Claim for Relief, awarding damages in favor of First Capital REIT and First Capital OP against Defendants Singal and FCREI in an amount to be determined at trial;

b)   On the Second Claim for Relief, awarding damages in favor of First Capital REIT and First Capital OP against Defendant Downey Brand in an amount to be determined at trial;

c)   On the Third Claim for Relief, awarding damages in favor of First Capital REIT and First Capital OP against Defendants Singal, FCREI, First Capital Advisors, the Forum Defendants and the Presidential Defendants in an amount to be determined at trial;

d)   On the Fourth Claim for Relief, awarding damages in favor of First Capital REIT and First Capital OP against Defendants Singal, FCREI, First Capital Advisors, the other FC Defendants, Forum Defendants and the PhotoMedex Defendants in an amount to be determined at trial;

e)  On the Fifth Claim for Relief, awarding damages in favor of First Capital REIT and First Capital OP against the FC Defendants in an amount to be determined at trial;

f)  On the Sixth Claim for Relief, awarding damages in favor of First Capital REIT and First Capital OP against the Forum Defendants, the Presidential REIT, Presidential OP and PhotoMedex in an amount to be determined at trial;

g)  On the Seventh Claim for Relief, awarding damages in favor of First Capital REIT and First Capital OP against the FC Defendants, Presidential REIT, Presidential OP, and PhotoMedex in an amount to be determined at trial;

h)  On the Eighth Claim for Relief, to enjoin the sale of assets to Presidential REIT and Presidential OP;

i)  On the Ninth Claim for Relief, to enjoin the sale of assets to Presidential REIT and Presidential OP;

j)  On the Tenth Claim for Relief, awarding damages in favor of First Capital REIT and First Capital OP against Defendants Singal and FCREI in an amount to be determined at trial;

k)  On the Eleventh Claim for Relief, awarding damages in favor of First Capital REIT and First Capital OP against Defendant Downey Brand in an amount to be determined at trial;

l)  On the Twelfth Claim for Relief, awarding damages in favor of First Capital REIT and First Capital OP against Defendants Singal, FCREI, First Capital Advisors, he Forum Defendants and the Presidential Defendants in an amount to be determined at trial;

m) On the Thirteenth Claim for Relief, awarding damages in favor of First Capital REIT and First Capital OP against the FC Defendants, the Forum Defendants, and PhotoMedex in an amount to be determined at trial;

n) On the Fourteenth Claim for Relief, awarding damages in favor of First Capital REIT and First Capital OP against the FC Defendants in an amount to be determined at trial;

o) On the Fifteenth Claim for Relief, awarding damages in favor of First Capital REIT and First Capital OP against the Forum Defendants in an amount to be determined at trial;

p) On the Sixteenth Claim for Relief, awarding damages in favor of First Capital REIT and First Capital OP against the FC Defendants in an amount to be determined at trial;

q) On the Seventeenth Claim for Relief, awarding damages in favor of First Capital REIT and First Capital OP against the Forum Defendants in an amount to be determined at trial;

r) On the Eighteenth Claim for Relief, ordering an accounting against FC Defendants; and

s) On the Nineteenth Claim for Relief, awarding damages in favor of First Capital REIT and First Capital OP against Defendant Downey Brand in an amount to be determined at trial; and

t) Award punitive damages, attorneys' fees and any other relief that the Court finds appropriate.

Dated: September 21, 2017

<div style="margin-left: 40%;">

LEWIS S. FISCHBEIN, P.C.

By: /s/ Lewis S. Fischbein
Lewis S. Fischbein, Esq.
270 Madison Avenue, 13th Floor
New York, New York 10016
Tel.: (212) 752-3374
lfischbein@wsmblaw.com

*Attorney for Plaintiffs*

</div>

`

VERIFICATION

STATE OF NEW YORK                    )
COUNTY OF NEW YORK               )
SOUTHERN DISTRICT OF NEW YORK   )

Jacob Frydman, being duly sworn, deposes and says that he is an individual and a Manager of JFURTI, LLC and, under the pains and penalties of perjury, does hereby verify that the facts set forth above are true to the best of his knowledge and, where indicated, are true based upon his information and belief.  The source of deponent's information and the ground of his belief are personal knowledge of these facts or information that has been provided to him upon which he bases his belief.

_____
Jacob Frydman, Individually and as a
Manager of JFURTI, LLC

Sworn to before me this
21st day of September, 2017

_____
NOTARY PUBLIC

LEWIS S. FISCHBEIN
Notary Public, State of New York
No. 314653144
Qualified in Westchester County
Commission Expires March 26, 20___