UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

JFURTI, LLC and JACOB FRYDMAN, Derivatively and On
Behalf of All Similarly Situated Limited Partners and
Shareholders in the Name and Right of FIRST CAPITAL REAL
ESTATE TRUST INCORPORATED and FIRST CAPITAL
REAL ESTATE OPERATING PARTNERSHIP, L.P.,

        Plaintiffs,

        -against-

SUNEET SINGAL, FRANK GRANT, RICHARD LEIDER,
FIRST CAPITAL REAL ESTATE ADVISORS, L.P. FIRST
CAPITAL REAL ESTATE INVESTMENTS, LLC,
PRESIDENTIAL REALTY CORPORATION, PRESIDENTIAL
REALTY OPERATING PARTNERSHIP, PHOTOMEDEX
INC., DOWNEY BRAND LLP, FORUM PARTNERS
INVESTMENT MANAGEMENT LLC, RUSSELL C. PLATT,
and FORUM GLOBAL FINANCE SCSp,

        Defendants,

        -and-

FIRST CAPITAL REAL ESTATE TRUST INCORPORATED
and FIRST CAPITAL REAL ESTATE OPERATING
PARTNERSHIPM L.P.,

        Nominal Defendants.

---

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 11|12|2018

17 Civ. 7206 (CM)

---

## DECISION AND ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS THE FIRST AMENDED COMPLAINT

McMahon, C.J.:

      Plaintiffs JFURTI, LLC ("JFURTI") and Jacob Frydman ("Frydman") bring this lawsuit

derivatively for the benefit of First Capital Real Estate Trust Incorporated (the "First Capital

REIT" or "REIT") and First Capital Real Estate Operating Partnership, L.P. (the "First Capital

OP") (collectively, the "Nominal Defendants").

By way of brief summary, Plaintiffs sold their ownership interests in several real estate entities to Suneet Singal ("Singal") and his affiliates in exchange for cash and stock in the REIT. To date, Plaintiffs have not been paid all that they are owed in connection with that transaction. The gravamen of the First Amended Complaint ("FAC") is that Defendants have defrauded Plaintiffs by entering into multiple "sham" transactions in order to deplete the REIT of its remaining assets and impair the ability of the REIT to make full payment to Plaintiffs for the original sale.

The FAC asserts derivative claims under the Securities Exchange Act, 15 U.S.C. §§ 78a and 78t(a), and rules promulgated thereunder, as well as under state and common law. Via two separate motions to dismiss (Dkt. Nos. 41 & 44), all Defendants argue that the FAC should be dismissed, pursuant to Federal Rules of Civil Procedure 12(b)(6) and 23.1.

This lawsuit is the third to be filed in this Court on the basis of the same underlying facts. Seven other lawsuits, arising from some of the transactions at issue here, have been filed in state court.

Like all but one of its predecessors, Plaintiffs' action misses the mark.

The avowed purpose of a derivative action is to right a wrong sustained by a corporation and its shareholders. But as the allegations of the FAC make clear, this lawsuit is animated by the fear that Defendants are transacting so as to frustrate Plaintiffs' attempts to collect on a judgment they are owed, not by any concern for their fellow shareholders' interests. No matter how legitimate that fear may be, the law is clear that a derivative action must be brought by litigants who are similarly situated with their fellow shareholders. Plaintiffs, who are particularly desirous in vindicating their own personal interests, do not meet that standard.

For the reasons set forth below, Defendants' motions to dismiss are GRANTED.

I.      **Factual Background**

a.  <u>The Parties</u>

JFURTI, a Delaware limited liability company, initially owned United Realty Trust Incorporated, the predecessor to First Capital REIT. (FAC ¶¶ 38, 54, Dkt. No. 36.) Frydman is the principal of JFURTI. (*Id.* ¶ 39.)

The named Defendants can be organized into the following five groups based upon their relationship and the nature of the allegations against them: (1) the "FC Defendants;" (2) the "Forum Defendants;" (3) the "Presidential Defendants;" (4) the "PhotoMedex" Defendant; and (5) the "DB" Defendant.

The FC Defendants include Singal, Frank Grant ("Grant"), Richard Leider ("Leider"), First Capital Real Estate Advisors, L.P. ("First Capital Advisors"), and First Capital Real Estate Investments, LLC ("FCREI"). Singal is the majority owner, CEO, and chairman of FCREI, First Capital Advisors, and First Capital REIT. (*Id.* ¶ 49.) Grant and Lieder are directors of First Capital REIT. (*Id.* ¶¶ 44–45.) FC Advisors is a Delaware limited partnership that operates and manages First Capital REIT's property portfolio as its "exclusive external advisor." (*Id.* ¶ 50.) FCREI is a Delaware limited liability company "through which Singal indirectly owns and/or controls First Capital Advisors and its affiliates." (*Id.* ¶ 51.)

The Forum Defendants include Forum Partners Investment Management ("Forum"), Russell C. Platt ("Platt"), and Forum Global Finance SCSp ("Forum Global"). Forum is a Delaware limited liability company. (*Id.* ¶ 41.) Platt serves as the CEO and Managing Director of Forum. (*Id.* ¶ 42.) SCSp is a partnership organized under the laws of Luxembourg, and is an affiliated company of Forum. (*Id.* ¶ 43.)

The Presidential Defendants include Presidential Realty Corporation ("Presidential REIT") and Presidential Realty Operating Partnership ("Presidential OP"). Presidential REIT is a New York real estate investment trust. (*Id.* ¶ 46.) Presidential OP is a Delaware limited partnership, which Plaintiffs allege was formed "for the purpose of carrying out the scheme alleged" in the FAC. (*Id.* ¶ 47.)

PhotoMedex refers to PhotoMedex, Inc., a Nevada Corporation. (*Id.* ¶ 48.)

DB refers to Downey Brand LLP, a law firm with offices in California and Nevada. (*Id.* ¶ 52.)

Nominal Defendant First Capital REIT is a Maryland real estate investment trust organized under the laws of Maryland. (*Id.* ¶ 53.) It is a public company that, according to Defendants, "has over [one] thousand public shareholders." (Memorandum of Law in Supp. Mot. to Dismiss on behalf of Singal, Grant, Leider, FC Advisors, FCREI, Presidential Defs. PhotoMedex, and DB ("Defs.' Opp.") at 47, Dkt. No. 43.) The REIT owns substantially all of First Capital OP, which, in turn, owns and controls special holding companies that possess the REIT's real estate assets. (FAC ¶ 53.)

b.  Summary of Transactions

Following are the four distinct transactions alleged in the FAC to give rise to various causes of action:

i.      **September 2015 Transaction**

Prior to September 15, 2015, First Capital REIT was United Realty REIT, a publicly registered REIT. It was founded and initially owned by Frydman and JFURTI. (*Id.* ¶ 54.)

4

On or about September 15, 2015, Frydman and JFURTI sold their interests in the REIT to Singal, FCREI, and six other entities under Singal's control.[1] (*Id.* ¶ 55.) The transaction, which was encompassed in the parties' Master [Sale] Agreement, was structured such that Frydman and JFURTI sold 100% of their interests in five United Realty entities[2] – which themselves owned the assets belonging to the REIT – to Singal and the other purchasing parties. (*Id.*; *see also* Ex. D ("Master Agreement").) The United Realty companies were rebranded under the First Capital emblem, with United REIT becoming First Capital REIT, and United Realty Capital Operating Partnership LP becoming First Capital OP. (*Id.*)

As consideration for receiving ownership interests in First Capital REIT, First Capital OP, and the entities that possessed the assets belonging to the REIT, Singal, FCREI, and the six other Singal-related companies agreed to make a series of payments to Plaintiffs and to contribute a portfolio of real estate to the REIT that the parties anticipated would enhance the value of the REIT. (*Id.* ¶ 58.)

### ii.    Forum Defendants' Loans

In June 2016, Plaintiffs allege that Singal and FCREI entered into various agreements with Forum, which, taken together, effected a transfer of control over the REIT to Forum. Forum agreed to provide "strategic advice" to FCREI, and, "[i]n connection with the strategic agreement," a Forum affiliate loaned FCREI $17.5 million. (*Id.* ¶ 110.) In exchange, Forum received 170,590.36 limited partnership units in OP and a "lucrative" interest in First Capital Advisors. (*Id.*) Since FC Advisors operates, manages, and controls the REIT, this "lucrative"

---

[1] The six Singal-controlled entities are: (1) First Capital Re Fund 1 LLC; (2) First Capital management Company LLC; (3) First Capital Management, LLC; (4) First Capital Retail, LLC; (5) First Capital Partners, LLC; and (6) First Capital Builders, LLC. (*Id.* ¶ 49 n.3.)

[2] The United Realty entities are as follows: (1) United Realty Advisors, LP; (2) United Realty Advisor Holdings, LLC; (3) URA Property Management LLC; (4) URTI GP, LLC and (5) URTI LP, LLC. (*Id.* ¶ 55 n.4.)

interest in FC Advisors, according to Plaintiffs, amounted to control over the management and operation of the REIT. (*Id.*)

### iii.    The Sale to Presidential REIT

On July 18, 2018, following Forum's obtaining a "lucrative" interest in FC Advisors, First Capital REIT announced in an 8-K disclosure that it had entered into a letter of intent to sell substantially all of its assets to Presidential REIT, in exchange for shares of Presidential REIT. (*Id.* ¶ 112.) On December 16, 2016, First Capital REIT entered into a "Definitive Agreement" with Presidential REIT and newly-founded Presidential OP, effectuating that arrangement ("the Presidential Transaction"). (*Id.* ¶ 113.)

The Presidential Transaction was structured such that First Capital REIT's shareholders received Class B shares of Presidential REIT, whose share class has the right to elect up to 25% of Presidential REIT's board of directors. (*Id.*) Meanwhile, Plaintiffs allege that, upon information and belief, Signal, his associates, and Forum Defendants acquired an unspecified amount of Presidential REIT's Class A shares, whose share class has the right to elect up to 75% of Presidential REIT's board of directors. (*Id.*)

### iv.    The PhotoMedex Agreement

On March 31, 2017, Singal, the Forum Defendants, and FC Advisors allegedly caused First Capital REIT and First Capital OP to enter into an agreement with PhotoMedex (the "PhotoMedex Agreement"), a global health products and services company that had sold substantially all of its assets in January 2017. (*Id.* ¶ 128.) This agreement required First Capital REIT and OP to contribute properties to PhotoMedex, allegedly valued at $30 million, and granted them an option to contribute two assets, allegedly valued at $66.5 million, at the

discretion of the REIT. (*Id.* ¶ 129.) As consideration for the transaction, the REIT received a

"limited percentage" of PhotoMedex stock. (*Id.*)

At the time of the transaction, PhotoMedex traded at $1.77 per share, and the entire value

of the company totaled approximately $4 million. (*Id.*)

c. Prior Litigation Between the Parties

The parties have been involved in nine other lawsuits in connection with one or more of

the transactions described above.

Many of these lawsuits derive from a settlement agreement ("Settlement Agreement")

that was executed by the parties in connection with the September 2015 Transaction. Singal,

FCREI, and the six Singal-related entities that were involved in the September 2015 transaction

defaulted on certain payment obligations under the parties' Master [Sale] Agreement. (*Id.* ¶ 55

n.5.) After re-negotiating the deal twice (the details of which are left undescribed in the FAC),

the parties entered into the Settlement Agreement, dated June 2, 2016, pursuant to which (*i*)

Frydman and JFURTI were to be paid $10 million cash immediately; (*ii*) Frydman and JFURTI

were to receive a $16,259,556.67 note, which was to be paid in installments through November

20, 2020 (the "JFURTI Note") (Decl. of Eric Levine ("Levine Decl.") Ex. C, Dkt. No. 42

(Settlement Agreement); (*iii*) FC Advisors and another FC-related entity guaranteed the JFURTI

Note (*id.* Ex. A (Promissory Note attached to Settlement Agreement); and (*iv*) FC Defendants

promised to indemnify Plaintiffs in connection with a debt incurred against one of the properties

contemplated in the parties' Master [Sale] Agreement. (*Id.* ¶ 2.)  In exchange for all this,

Plaintiffs agreed, among other things, to release any personal claims they could assert against

Singal, FCREI, FC Advisors, and the REIT. (*Id.* Ex. E ¶ 1 (Release Agreement).)

Shortly after executing the Settlement Agreement, Plaintiffs filed three successive actions in New York Supreme Court, alleging that FC Defendants failed to make the indemnification payments as required under that agreement, which constituted a default under the JFURTI Note and entitled Plaintiffs to accelerated payment of $16,259,556.67, *i.e.*, the entire value of the Note. *See JFURTI, LLC v. First Capital Real Estate Advisors, L.P., et al.*, Index No. 653823/2016 (Sup. Ct., N.Y. Cnty.), *JFURTI, LLC v. First Capital Real Estate Investments, LLC et al.*, Index No. 653824/2016 (Sup. Ct., N.Y. Cnty.), and *JFURTI, LLC v. First Capital Real Estate Investments, LLC et al.*, Index No. 653825/2016 (Sup. Ct., N.Y. Cnty.). The New York Supreme Court determined that no default under the JFURTI Note had yet occurred, and dismissed all three of those actions.[3]

Plaintiffs then filed yet another action in New York Supreme Court. *See JFURTI, LLC v. First Capital Real Estate Trust Incorporated, et al.*, Index No. 654157/2016 (Sup. Ct., N.Y. Cnty.). In that case, Plaintiffs asserted the same alleged breach of the Settlement Agreement – that the FC Defendants had not made the require indemnification payments, permitting acceleration of the JFURTI Note – and also argued that this conduct also triggered JFURTI's right under a separate security agreement that the parties had signed. Plaintiffs withdrew this action prior to receiving a decision on a motion to dismiss.

In August 2016, following the initial public announcement of the Presidential Transaction, Plaintiffs filed a derivative lawsuit in New York Supreme Court seeking to enjoin that transaction by way of a temporary restraining order. *See JFURTI, LLC v. Singal et al.*, Index No. 654477/2016 (Sup. Ct., N.Y. Cnty.). Plaintiffs argued that the Presidential Transaction

---

[3] Defendants state that, in October 2016, Frydman filed a direct, third-party complaint against FC Advisors seeking indemnity on certain claims in connection with the Settlement Agreement. (Defs.' Opp. at 25 n.12.) Defendants did not provide a citation for that case or elaborate on the outcome, and the Court was not able to locate that case independently.

would strip the REIT of its assets and revenues, leaving it incapable of paying its debts –

including the $16,259,556.67 owed under the JFURTI Note. (*See also* Levine Decl. Ex. H ¶ 48.)

The New York Supreme Court denied Plaintiffs' request for a temporary restraining order,

reasoning that Plaintiffs did not adequately demonstrate that the value of the Presidential REIT

shares would remain low even after the Presidential Transaction was consummated, *i.e.*, once the

properties belonging to First Capital REIT were transferred to Presidential REIT and

incorporated in its share price. (Levine Decl. Ex. I at 5:20-26 (transcript of hearing regarding

temporary restraining order).) After the court indicated that an application for a preliminary

injunction would be futile, (*id.* at 16:12-20), Plaintiffs voluntarily discontinued the action.

Plaintiffs then filed a derivative action in this Court. *See JFURTI, LLC, et al. v. Forum*

*Partners Inv. Management, LLC, et al.*, No. 16 Civ. 8633. That lawsuit bears a very strong

resemblance to this one, except that PhotoMedex was not a party to that case, because the

PhotoMedex Agreement occurred after the complaint and first amended complaints were filed.

This Court dismissed that case, because Plaintiffs failed to make demand on the REIT's board of

directors in accordance with Maryland law.

JFURTI then sued once more in New York Supreme Court, alleging that the obligors on

the JFURTI Note had missed two interest payments, which permitted it to accelerate the Note

and obtain judgment on the entire amount due. This time, JFURTI was successful: The court

entered summary judgment in JFURTI's favor and ordered FC Defendants to pay

$21,221,676.53 (the $16,259,556.67 due under the JFURTI Note, plus accelerated interest).

(Levine Decl. Ex. L.) Although Plaintiffs do not state so explicitly in the FAC, it is clear from

the parties' moving papers that this judgment has not been paid. JFURTI has served restraining

notices on Singal, FC Advisors, FCREI, and the other defendants in the New York Supreme Court action, seeking to collect the judgment. (Levine Decl. Ex. M.)

Finally, after filing the present action, Plaintiffs filed a direct action against DB, alleging breach of contract. *See JFURTI LLC, et al. v. Downey Brand LLP*, No. 17 Civ. 8945. The Court dismissed that case, concluding that Plaintiffs lacked individual standing to assert claims for injuries that they characterized in their pleadings as belonging to the corporation, not to them individually.

d. Demand

On May 24, 2017, Plaintiffs sent a written demand letter to Suneet Singal, Frank Grant, and Richard Leider, the three members of the REIT's board of directors, demanding that "an independent investigatory body comprised of individuals not currently associated with the REIT" undertake an investigation into alleged breaches of fiduciary duty "and other violations set forth below." (FAC Ex. A ("Demand Letter") at 3.)

The Demand Letter lists a number of offending transactions, including alleged "misrepresentations [by Singal] with respect to properties contributed to the REIT through the Master Agreement executed on September 15, 2015" (*id.* at 2); First Capital's "entering into various loan agreements with Forum Partners Investment Management at criminally usurious repayment rates" (*id.*); the Presidential Transaction (*id.* at 1); the PhotoMedex Agreement (*id.* at 2–3); and the further depletion of First Capital REIT's cash and non-cash assets (*id.* at 1–2). In addition to taking "legal action against all persons" for violations documented therein, (*id.* at 1), the Demand Letter further requested that Singal be removed as CEO and chairman of the board, that the results of an investigation conducted by an independent investigatory body be disclosed

to "the proper governing authorities," and that the REIT "immediately file any and all outstanding financial disclosure documents and annual audited financial statements." (*Id.* at 3.)

Singal responded to Frydman by letter, stating that the Demand Letter "raise[d] significant and complex issues, which the Company takes very seriously[,]" and was reviewing. (*Id.* Ex. C. at 1.) The board of First Capital REIT then appointed a special litigation committee consisting of Grant and Leider to investigate. (FAC ¶ 27.) It also authorized the special litigation committee to retain Eiseman Levine Lehraupt & Kakoyiannis, P.C. to advise and conduct the investigation. (*Id.*)

On January 23, 2018, First Capital REIT's assistant general counsel informed Plaintiffs that, after conducting "an independent, good faith investigation into [their] allegations," the independent members of the board concluded that no additional action was necessary or warranted." (*Id.* Ex. B at 1 (demand refusal letter).)

In response, Plaintiffs filed this purported derivative lawsuit on behalf of First Capital REIT, First Capital OP, and all shareholders and limited partners thereof, who are similarly situated.

e.  <u>Present Lawsuit</u>

The FAC contains fifteen causes of action.

<u>Counts 1 & 11</u>

Counts 1 & 11 assert that Singal and FCREI committed securities fraud, pursuant to Section 10(b) of the Exchange Act and Rule 10b-5, and common law fraud, respectively, in connection with the September 2015 Transaction. The crux of Plaintiffs' claims is that Singal and FCREI fraudulently promised to contribute certain properties to the REIT that they did not

ultimately contribute, which defrauded Plaintiffs from the benefit of the bargain. (*Id.* ¶ 57.) Plaintiffs identify four sets of misrepresentations.

*First*, Singal and FCREI allegedly promised to contribute eight properties that were to be transferred to the REIT by deed (the "Deed Properties"). (*Id.* ¶ 62.) Plaintiffs allege that Singal and other FC Defendants represented that title to the Deed Properties was good, marketable, and insurable; that the title to be conveyed was free from all liens and encumbrances, subject only to certain permitted exceptions; that execution, delivery, and performance under the parties' agreement was within their power; and that they would undertake to promptly record the deeds to the eight properties after the transaction. (*Id.* ¶¶ 63–65; *id.* Ex. D §§ 5.10(b) & (c)(i), (iii).) Each of these representations, according to Plaintiffs, was knowingly false when made.

*Second*, Plaintiffs allege that Singal and FCREI misrepresented the transferability of five properties located in New Mexico (the "NM Properties"). Prior to closing the September 15 Transaction, Frydman discovered that certain third parties filed quitclaim deeds purporting to own each of the NM Properties. (*Id.* ¶ 76.) In response to inquiries questioning whether FC Defendants had the ability to transfer interests in the NM Properties, Singal and FCREI represented that the third-party quitclaim deeds were "fraudulent, unauthorized and invalid." (*Id.* ¶ 78; *see also id.* ¶ 81.) According to Plaintiffs, these representations were false, as ownership of the NM Properties was the subject of a "bonafide [*sic*] and valid dispute," which prevented Singal and FCREI from fulfilling their obligations under the Master [Sale] Agreement. (*Id.* ¶ 80.)

*Third*, Singal and FCREI allegedly misrepresented the transferability of four hotel properties located in New Mexico and Texas (the "Hotel Properties"), which were owned by a special purpose entity ("SPE"). Singal and FCREI allegedly told Plaintiffs that the interests held by the SPE would be assigned to Singal and FCREI prior to the September 2015 Transaction, so

that they could then convey those interests to First Capital REIT. (*Id.* ¶¶ 87–92.) Those

representations were memorialized in various Assumption and Assignment Agreements. (*Id.* ¶

88; *id.* Exs. G, H (Assignment and Assumption Agreements).) Plaintiffs claim that Singal and

FCREI – rather than transfer the interests to the Hotel Properties to the REIT, in accordance with

the terms of the September 2015 Transaction – entered into a "secret agreement" with the

holding company of the SPE to effectuate the transfer of the interests to the Hotel Properties to

another entity that was affiliated with FCREI, preventing their transfer to the REIT. (*Id.* ¶ 95.)

*Fourth*, Singal and FCREI allegedly misrepresented the transferability of eight hotels

located in New Mexico and Texas (the "Texas Hotels"[4]) that were owned by an SPE whose

parent company was in bankruptcy. (*Id.* ¶ 99.) According to Plaintiffs, Singal and FCREI

represented that full title to the Texas Hotels could be transferred without leave of the

bankruptcy court. (*Id.* ¶¶ 100–101.) Once again, the parties memorialized these representations

in various Assumption and Assignment Agreements, which were ultimately incorporated into

September 2015 Transaction documents. (*Id.* ¶¶ 102–104; *id.* Ex. D § 5.10(c)(i)-(ii); *id.* Ex. E. §

3.2; *see also id.* Exs. I, J (Assignment and Assumption Agreements).) And here, too, Plaintiffs

allege that Singal and FCREI secretly engaged in double dealing immediately after the

September 15 Transaction closed, promising to transfer the Texas Hotels to another entity that

was affiliated with Singal and FCREI but unrelated to First Capital REIT. (*Id.* ¶ 107.)

### Counts 2 & 12

Plaintiffs assert the same causes of action – securities fraud, in violation of Section 10(b)

of the Exchange Act and Rule 10b-5, and common law fraud, respectively – against DB in

connection with the September 2015 Transaction. Plaintiffs identify two material

---

[4] The FAC refers to these properties as the "Texas Hotels," even though some are located in New Mexico.
(*Id.* ¶ 99.) The Court will adhere to that convention for consistency's sake.

misrepresentations by DB – one relating to the Deed Properties and one relating to the NM Properties.

With regard to the former, DB acknowledged and agreed in writing that, as escrow agent acting on the parties' behalf, it would "cause each of the deeds [relating to the Deed Properties] to be filed of record in the appropriate recording offices" by September 21, 2015. (*Id.* Ex. F at 1 (letter between Frydman and DB, dated September 15, 2015).) Regarding the latter, DB acknowledged in that same letter that the quitclaim deeds filed by third-parties who purported to own each of the NM Properties was "invalid and unauthorized," since "FCREI has the right to transfer 100% of the ownership" of those properties. (*Id.*)

According to Plaintiffs, both of these misstatements were made either with the knowledge that they were false or that DB should have known that they were false, given their position as competent counsel that had represented FC Defendants in prior real estate matters.

<u>Counts 3 & 13</u>

In Count 3, Plaintiffs assert that Singal, FC Advisors, Grant, Leider, Forum Defendants, and Presidential Defendants committed securities fraud, in violation of Section 10(b) of the Exchange Act and Rule 10b-5, in connection with the Presidential Transaction. Plaintiffs allege that Presidential Transaction was a "sham" transaction whose true, undisclosed purpose was to "strip the REIT of assets and REIT's shareholders of voting control with respect to those assets, [] to transfer said assets and control to a new entity that Singal and Forum Defendants would control" (*id.* ¶ 112), and to drain First Capital REIT's revenue stream so as to prevent it from paying debts it owed to FC Advisors and rendering FC Advisors "judgment proof." (*Id.* ¶¶ 115, 117–118.)

Count 13, in which Plaintiffs assert that the conduct described above amounts to common law fraud, mirrors Count 3, with the exception that Count 13 is also brought against FCREI.

### Counts 4 & 14

Plaintiffs assert that FC Defendants, Forum Defendants, and PhotoMedex Defendants committed securities fraud, in violation of Section 10(b) of the Exchange Act and Rule 10b-5, and common law fraud, in connection with the PhotoMedex Agreement. Like the Presidential Transaction, the PhotoMedex Agreement allegedly was a "sham," (*id.* ¶ 126), designed to further consolidate control over the assets that previously belonged to the REIT in the hands of FC Defendants and Forum Defendants, both for the purposes of looting the REIT of valuable assets and revenue it could use to pay its debts, and so as to personally enrich Defendants at shareholders' expense. (*Id.* ¶¶ 133, 202–204.)

### Count 5

Plaintiffs assert that Grant, Leider, and Forum Defendants are liable for control person liability, pursuant to Section 20(a) of the Exchange Act, on the basis of the securities fraud violations that they allegedly committed.

Despite serving as independent directors of the REIT, Grant and Leider allegedly put Signal's interests ahead of the REIT's, (*id.* ¶ 214), and were "aware of and participated in the scheme orchestrated by Signal, FC Advisors, and Forum Defendants to dissipate assets from the REIT and enrich Signal and Forum Defendants." (*Id.* ¶ 212.)

According to Plaintiffs, Forum Defendants, like Grant and Leider, are motivated, not by a concern for the REIT's shareholders, but rather by their own interests and those of Signal. (*Id.* ¶ 217.) Once the Forum Defendants acquired a "lucrative" interest in FC Advisors, they allegedly "embedd[ed] their own management personnel into the upper echelons of First Capital Advisors

and require[d] First Capital Advisors to seek their approval over virtually all material decisions[.]" (*Id.* ¶ 216.)

Counts 6, 7, 15, 16, & 17

Plaintiffs allege that FC Defendants breached their fiduciary duties to First Capital REIT and First Capital OP (Count 6), and that Forum Defendants, Presidential Defendants, and PhotoMedex aided and abetted those breaches (Count 7). They allege that FC Defendants committed waste (Count 15) that was aided and abetted by Forum (Count 16). And they allege that FC Defendants are liable for accounting (Count 17). The basis for these five causes of action is as follows:

In addition to consummating the Presidential Transaction and PhotoMedex Agreement – transactions that, according to Plaintiffs, "each constitute a fraudulent conveyance" (*id.* ¶ 228) – FC Defendants purportedly have (*i*) failed to file any SEC-required quarterly or annual financial statements or reports; (*ii*) published a net asset value per share of REIT stock as $16.03 per share, up from $12.49 per share, without providing adequate public disclosure to support this increased valuation and in order to conceal their alleged fraudulent conduct; and (*iii*) caused the REIT to default on six mortgages in its portfolio, including losing title to one property for non-payment of taxes.

Plaintiffs further allege that FC Defendants took additional steps to strip First Capital REIT and First Capital OP of its assets. Plaintiffs identify two property transactions whereby First Capital REIT, through subsidiaries, sold assets and then used the proceeds from those sales to satisfy obligations that were not related to First Capital REIT or First Capital OP. (*Id.* ¶¶ 135–139.) Upon information and belief, these actions have caused at least four of First Capital REIT's direct and indirect subsidiaries to file for bankruptcy. (*Id.* ¶ 140.)

16

Moreover, FC Defendants and Forum Defendants allegedly dissipated publicly available funds. From September 15, 2015 through February 28, 2016, First Capital REIT raised approximately $17 million through a public offering of common stock. (*Id.* ¶ 146.) Officers and employees of First Capital REIT allegedly informed Plaintiffs (on undisclosed dates) that First Capital REIT no longer possesses the $17 million; what happened to the money has not been explained. (*Id.* ¶¶ 146–149.)

### Count 8

Plaintiffs allege that FC Defendants, Forum Defendants, Presidential REIT, Presidential OP, and PhotoMedex are liable for fraudulent conveyance, pursuant to N.Y. Debtor & Creditor Law ¶¶ 274–276. The core of this claim is that these transactions were consummated with the actual intent of defrauding the Nominal Defendants' creditors "with the purpose of rendering [them] judgment proof." (*Id.* ¶ 245.) Plaintiffs seek to set aside those transactions. (*Id.* ¶¶ 246–248.)

### Counts 9 & 10

The FAC also asserts two counts for "injunctive relief," (Counts 9 & 10). Neither of these, however, is an independent claim upon which relief could be granted, since injunctions are remedies, not claims. *See Chiste v. Hotels.com L.P.*, 756 F. Supp. 2d 382, 408 (S.D.N.Y. 2010).

## II.    Discussion

Defendants move to dismiss the FAC on the grounds that Plaintiffs (*i*) failed to make a proper pre-suit demand on the REIT's board of directors, pursuant to Fed. R. Civ. P. 23.1, (*ii*) are inadequate representatives to sue derivatively, pursuant to Fed. R. Civ. P. 23.1, and (*iii*) failed to state a claim upon which relief may be granted, pursuant to Fed. R. Civ. P. 12(b)(6). The Court need not address the third ground, as this case falls on the second.

a.  Demand

The Federal Rules of Civil Procedure prescribe special pleading requirements for shareholder derivative actions; among them is a directive that a complaint "state with particularity any effort" by a plaintiff to demand action by the board of directors of the corporation and the reasons for the failure to obtain such action. Fed. R. Civ. P. 23.1(b)(3). The demand requirement derives from the fundamental principle of corporate law that the corporation is the real party in interest in a derivative suit, and the substantive claims belong to the corporation. Demand ensures that a plaintiff stockholder is asserting the rights of the corporation because the corporation refuses to vindicate its own rights. *Bosley v. Baltimore Cnty, Md.*, 804 F. Supp. 744, 751 (D. Md. 1992), *aff'd*, 986 F.2d 1412 (4th Cir. 1993) (applying Maryland law).

The contours of the demand requirement is a substantive issue governed by the law of the state of incorporation. *See Kamen v. Kemper Fin. Serv., Inc.*, 500 U.S. 90, 108 (1991); *Brody v. Chemical Bank*, 482 F.2d 1111, 1114 (2d Cir. 1973). Because First Capital REIT is a Maryland corporation, Maryland's demand jurisprudence controls.

Maryland law provides that a demand on the board "must identify the alleged wrongdoers, describe the factual basis of the wrongful acts and the harm caused to the corporation, and request remedial relief." *Bender v. Schwartz*, 917 A.2d 142, 154 (Md. Ct. Spec. App. 2007) (quoting *Allison v. General Motors Corp.*, 604 F. Supp. 1106, 1117 (D. Del. 1985), *aff'd*, 782 F.2d 1026 (3d Cir. 1985)). A shareholder need not specify his legal theory, nor must he detail every fact in support of that theory, since "decisions as to how and on what theory the corporation will pursue wrongdoers are the proper province of the Board of Directors." *Id.* The sufficiency of a demand letter is tied to its ultimate purpose – to apprise directors of alleged

misconduct, permit them to conduct an investigation, and take remedial action if needed. *Id.* at 152; *see also Allison*, 604. F. Supp. at 1117.

Where, as here, a board determines not to take action in response to a demand letter, the board is generally presumed to have acted in exercise of sound business judgment. *Boland v. Boland*, 423 Md. 296, 328 (2011). "The protection of the business judgment rule 'can be claimed only by disinterested directors whose conduct otherwise meets the tests of business judgment.'" *Id.* at 329 (quoting *Werbowsky v. Collomb*, 362 Md. 581, 609 (2001)). Therefore, in order to maintain a derivative action, plaintiffs must plead with particularity facts that create a reasonable doubt that the board's decision not to bring the requested action is protected by the business judgment rule, *i.e.*, that the board's decision not to pursue litigation was not conducted independently, in good faith, and on an informed basis. *Id; see also Bender*, 917 A.2d at 152–53.

Maryland courts have identified six indicia of a reasonable, good faith investigation:  (1) whether the committee engaged independent counsel to assist in the investigation; (2) whether the committee produced a report, the length of such report, and whether it documented the committee's procedures, reasoning, and conclusions; (3) whether the committee properly identified the claims at issue; (4) whether the committee reviewed the testimony of or interviewed directors, officers, and employees; (5) whether the committee reviewed documents regarding the challenged transactions; and (6) the number of times the committee met. *Bender*, 917 A.2d at 155–56; *see Scalisi v. Grills*, 501 F. Supp. 2d 356, 363 (E.D.N.Y. 2007) (applying Maryland law).

Plaintiffs' demand was adequate. The Demand Letter stated with particularity the transactions that it believed to be unlawful, which parties were involved in those transactions, when those transactions took place, and the consequences of those transactions. It emphasized

19

that the allegedly wrongful actions caused harm to the REIT, as a corporation, and its shareholders. While Plaintiffs did not articulate every cause of action they now allege, they were not required to do so. *Id.* Rather, it is enough that these allegations were articulated specifically enough so as to give directors a fair opportunity to initiate the action requested by Plaintiffs. *Bender*, 917 A.2d at 154.

And, in fact, we know this to be the case. Defendants said so. They conceded in their initial response to the Demand Letter that they understood the allegations raised by Plaintiffs, writing that they "raise significant and complex issues, which the Company takes very seriously. The Company is in the process of reviewing the issues raised." (FAC Ex. C.).) Moreover, Defendants' challenge to the adequacy of demand is further controverted by the very fact that Plaintiffs' Demand Letter did as it was intended: it spurned the development of a special litigation committee and caused the REIT to undertake an investigation. It is disingenuous for Defendants to now argue that the Demand Letter was inadequate.

While the refusal to bring suit in the face of a demand letter is ordinarily subject to the business judgment rule, under Maryland law, "demand refused" cases are rarely decided solely on the pleadings, given the fact-intensive nature of the inquiry that is needed to address whether a board conducted a reasonable investigation. *Kautz v. Sugarman*, No. 10 Civ. 3478 RJS, 2011 WL 1330676, at *7 (S.D.N.Y. Mar. 31, 2011), *aff'd*, 456 F. App'x 16 (2d Cir. 2011) (applying Maryland law); *see also Bender*, 917 A.2d at 151 (affirming grant of motion under Maryland Rule 2–502, whereby circuit court conducted a bench "trial on the merits" regarding the reasonableness of the board's investigation). That rule applies here. The Court knows very little about the special litigation committee's investigation. It does not know whether the committee interviewed directors, officers, or other employees; whether it produced a report; whether it

20

reviewed documents regarding the challenged transactions; or the number of times it met. In the absence of more detailed facts regarding the process and methodology employed by the REIT's special litigation committee, the Court cannot at this moment say that the investigation was reasonable and is entitled to business judgment deference.

b. Adequacy of Representation

Rule 23.1 provides that a derivative action "may not be maintained if it appears that the plaintiff does not fairly and adequately represent the interests of shareholders or members who are similarly situated in enforcing the right of the corporation or association." Fed. R. Civ. P. 23.1(a). Because representative shareholders seek to protect the interests beyond their own personal stakes in a corporation, the representative stands in a fiduciary relationship with the corporation and the other shareholders. *See Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 548 (1949). As explained by the Court of Appeals:

> The rationale for binding nonparty stockholders by a judgment in a derivative action is that a plaintiff-stockholder represented their interests in that litigation. If nonparty stockholders are to be conclusively bound by the results of an action prosecuted by a stockholder ostensibly representing their interests, however, fundamental considerations of fairness and justice demand that the representation be adequate.

*Papilsky v. Berndt*, 466 F.2d 251, 260 (2d Cir. 1972).

As a preliminary matter, the Court notes that, in pressing their arguments regarding adequacy of representation, Defendants cite to cases from Maryland state court and the U.S. District of Maryland. Plaintiffs do the same in their opposition papers. The Court presumes the parties did so because First Capital REIT is a Maryland Corporation. Maryland law attaches to substantive issues, such as determining whether demand is adequate (as seen above) and whether a claim is direct or derivative (as will be seen below). But adequacy of representation is a procedural issue governed squarely by Rule 23.1. Under the *Erie* doctrine, a well-established

legal doctrine of civil procedure dating back to the Supreme Court's landmark decision in *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938), procedural issues in federal court are governed by federal law. The Southern District of New York lies in the Second Circuit, and therefore is bound by Second Circuit law interpreting and applying Rule 23.1 (even though, as a practical matter, there does not appear to be a material difference in the way courts in this District and those in the District of Maryland interpret that rule).

Turning to the adequacy of representation inquiry under Rule 23.1, this requirement is analogous to the requirement under Federal Rule of Civil Procedure 23(a)(4) that a representative party in a class action fairly and adequately protect the interests of the class. *In re Facebook, Inc., Sec. & Deriv. Litig.*, No. 13 Civ. 2830 (RWS), 2013 WL 6798160, at *23 (S.D.N.Y. Dec. 23, 2013), *aff'd sub nom. In re Facebook, Inc., Initial Pub. Offering Deriv. Litig.*, 797 F.3d 148 (2d Cir. 2015). An adequate representative must have the capacity to prosecute a derivative suit vigorously and need be free from interests that are antagonistic to the interests of the class. *See, e.g., Sweet v. Bermingham*, 65 F.R.D. 551, 554 (S.D.N.Y. 1975). Courts consider a number of factors bearing on the adequacy of representation, including:

1. Economic antagonisms between the representative and class;
2. Other litigation pending between the plaintiff and the defendants;
3. The relative magnitude of the plaintiff's personal interest in matters beyond the scope of the derivative action, as compared to his or her interest in the derivative action;
4. The plaintiff's vindictiveness towards the defendants; and
5. The degree of support the plaintiff receives from the other shareholders that he or she purports to represent.

J. Moore et al., Moore's Federal Practice – Civil § 23.1.09 (2018) (citing cases); *see also Priestley v. Comrie*, No. 07 CV 1361 (HB), 2007 WL 4208592, at *6 (S.D.N.Y. Nov. 27, 2007) (citing same factors).

Courts generally have found that the defendant bears the burden of showing that the plaintiff is an inadequate representative. *In re JPMorgan Chase & Co. S'holder Derivative Litig.*, No. 08 CIV. 974 (DLC), 2008 WL 4298588, at *8 (S.D.N.Y. Sept. 19, 2008) (citations omitted). *But see Spira v. Nick*, No. 94–cv–7066(LAK), 1997 WL 793052, at *1, *4 (S.D.N.Y. Dec. 29, 1997) (court *sua sponte* ordered party to show cause why action should not be dismissed for lack of adequate representation under Rule 23.1 and noted that "burden of establishing adequacy of representation in representative actions like this is on the proposed representative party.").

Applying these tests, Frydman and JFURTI are inadequate derivative plaintiffs in this case. Most fundamentally, they are motivated principally by their own financial interest, which differ from that of their fellow shareholders. The Plaintiffs' litigation history and pleadings make this abundantly clear.

In the various lawsuits pursued by Plaintiffs in other forums, Plaintiffs have been quite transparent about the fact that they are seeking to collect the money they are owed under the Settlement Agreement. The first five actions brought by Plaintiffs, all in state court, alleged breaches of the 2016 Settlement Agreement. In *JFURTI, LLC v. Singal et al.*, Index No. 654477/2016, where Plaintiffs filed a derivative lawsuit seeking to enjoin the Presidential Transaction, Plaintiffs were explicit about their concern that the "net effect of [the Presidential Transaction] will be to strip First Capital REIT and the First Capital Borrower and Guarantors of all of their assets, revenues, and income streams, *leaving them incapable of paying the $16,259,556.67 obligation under the Note and the Guarantees*" and, therefore, with "*no ability to pay the debt owed to Plaintiffs*." (Levine Decl. Ex. H ¶ 48 (complaint) (emphases added).) And, of course, in *JFURTI, LLC v. Singal, et al.*, 656273/2016, JFURTI sued directly under the JFURTI Note and obtained a $21,221,676.53 judgment that they apparently have yet to collect.

In this case, while Plaintiffs are less explicit about their motivations, those motivations are no less clear to the Court. The FAC repeatedly alludes to a concern that the Presidential Transaction would render FC Advisors "judgment proof" – a concern that is singularly relevant to Plaintiffs, but matters not a whit to the ordinary shareholder. (FAC ¶¶ 115, 117–18, 122, 124, 145, 212, 245.) *Owen v. Modern Diversified Indus., Inc.*, 643 F.2d 441, 443–444 (6th Cir. 1981) is instructive.

In *Owen*, the plaintiff alleged that the board of a company in which he invested was liable for violations of the Exchange Act of 1934 and other state and common law violations. The Sixth Circuit determined that he was an inadequate representative to sue derivatively under Rule 23.1, because he owned debentures of substantial value in the nominal defendant-corporation while possessing a comparatively smaller equity interest. *Id.* Motivating the court's decision was a concern that the plaintiff might use the derivative suit as a "device to obtain leverage" over the corporation. *Id.* at 443. While the plaintiff in *Owen* owned a smaller equity interest in the company than what Plaintiffs own in the REIT here, the Sixth Circuit's conclusion ultimately turned on the fiduciary nature of the derivative suit and how a plaintiff who possesses a disproportionately larger personal stake in a company, apart from her stock, is dissimilarly situated from her fellow shareholders. *Id.* at 444. In so reasoning, the court cited with favor the Fifth Circuit's directive in *Blum v. Morgan Guaranty Trust Co. of New York* that a plaintiff is an inadequate representative under Rule 23.1, if his stake in the derivative suit "'pale[s]' in comparison" to his interest in an "outside entanglement[]" – in that case, the outside entanglement being a note between him and the corporation. 539 F.2d 1388, 1390 (5th Cir. 1976).

Other courts have applied the holding in *Owen* to facts that are analogous to this case. For example, in *Rothenberg v. Security Management Co.*, 667 F.2d 958, 960–62 (11th Cir. 1982), the plaintiff was found to be inadequate because, in addition to being a shareholder, he was a judgment creditor of the corporation. In *ShoreGood Water Co. v. U.S. Bottling Co.*, No. 08 Civ. 2470 (RDB), 2009 WL 2461689, at *5 (D. Md. Aug. 10, 2009), the plaintiff was deemed an inadequate derivative plaintiff because he was a creditor of defendant-corporation and was in a dispute with the corporation over that debt. In *WPP Luxembourg Gamma Three Sarl v. Spot Runner, Inc.*, No. 09 Civ. 2387 (DMG), 2013 WL 12203024, at *12 (C.D. Cal. Apr. 4, 2013), the fact that plaintiff's personal interest in a direct claim "dwarf[ed] its interest in its derivative claims" rendered him inadequate. And in *Argiropoulos v. Kopp*, No. 06 Civ. 0769, 2007 WL 954747 (CBC), at *8 (D. Md. Mar. 26, 2007), the court ruled that a plaintiff who asserted that the "corporation owes him significant amounts of money" was a non-representative derivative plaintiff because he and the shareholders generally "are competing for the same pool of money, which, under Maryland law, could create a conflict." *See also, G.A. Enterprises v. Leisure Living Commun., Inc.*, 517 F.2d 24, 26 (1st Cir. 1975) (plaintiff, a judgment creditor, deemed inadequate representative, because court was concerned that suit would be used as leverage); *Renz v. Carota*, No. 87 Civ. 0487 (TJM), 1991 WL 1656767, at *3 (N.D.N.Y. Aug. 26, 1991), *aff'd*, 963 F.2d 1521 (2d Cir. 1992) (plaintiff's derivative action did not fairly and adequately represent shareholders because plaintiff's foremost concern was to gain "leverage" over corporation in battle over control of corporation).

The conclusion that economic antagonism between the JFURTI Plaintiffs and the other REIT shareholders disqualifies the former from representing the latter in a derivative suit brought pursuant to Rule 23.1 is inescapable. It is perfectly clear, from the parties' litigation

history, that Plaintiffs are using this derivative suit as a device to obtain leverage over the

Defendants, in the hope of collecting the $21,221,676.53 they are owed pursuant to the state

court judgment. Any diminution of the value of their REIT interests is dwarfed by their

individual claim arising out of the judgment. And, of course, Plaintiffs' recovery on that

judgment (which, as a matter of law, has priority over the interests of the REIT's shareholders)

would diminish any return to shareholders generally. For that reason, Plaintiffs' interests and

incentives are not aligned with their fellow shareholders. *See Ryan v. Aetna Life Ins. Co.*, 765 F.

Supp. 133, 135–137 (S.D.N.Y. 1991); *accord Koenig v. Benson*, 117 F.R.D. 330, 334–335

(E.D.N.Y. 1987).

The court knows nothing about whether Plaintiffs tried and failed to recruit other, more

representative shareholders to join them as named plaintiffs, but the fact that they have brought

repeated derivative actions without anyone else's becoming interested enough to join them

suggests that the other shareholders of the REIT may feel more like the Board does and less like

Plaintiffs do about the claims in suit. *Martinez v. Barasch*, No. 01 Civ. 2289 (MBM), 2005 WL

2465493, at *5 (S.D.N.Y. Oct. 5, 2005); *see also Meimaris v. Hudner*, No. 94 Civ. 7082 (JSM),

1995 WL 413164, at *1 (S.D.N.Y. July 12, 1995).

There is, however, an additional reason why Plaintiffs are inadequate representatives. The

claims asserted by Plaintiffs in connection with the September 2015 Transaction, which were

pleaded as derivative claims, are, in fact, direct claims. And the assertion of direct claims by a

derivative plaintiff gives rise to an "inherent conflict of interest," one that has long been

recognized in this Circuit as disqualifying under Rule 23.1. *St. Clair Shores Gen. Emps. Ret. Sys.*

*v. Eibeler*, No. 06 Civ. 0688 (SWK), 2006 WL 2849783, at *7 (S.D.N.Y. Oct. 4, 2006) (citing

cases).

The law of the state of incorporation governs the question of whether a particular shareholder suit is direct or derivative. *Seidl v. Am. Century Cos., Inc.*, 713 F. Supp. 2d 249, 255 (S.D.N.Y.2010), *aff'd*, 427 F. App'x 35 (2d Cir. 2011). Because the Nominal Defendants are incorporated in Maryland, Maryland law controls.

Under Maryland law, whether an action is direct or derivative is a question of fact that is not governed by the label placed on a complaint by a plaintiff. *Paskowitz v. Wohlstadter*, 822 A.2d 1272, 1277 (Md. Ct. Spec. App. 2003) (citations omitted). The key inquiry is whether a stockholder suffered a "separate and distinct" injury from the injuries suffered by the corporation. *Mona v. Mona Elec. Grp., Inc.*, 934 A.2d 450, 464 (Md. Ct. Spec. App. 2007); *see also Strougo v. Bassini*, 282 F.3d 162, 172 (2d Cir. 2002) ("[T]he rule under Maryland law is that where shareholders suffer a distinct injury, *i.e.*, an injury that does not derive from corporate injury, they may bring [a] direct suit, even if their injury is undifferentiated among them.").

Here, Plaintiffs suffered an injury in connection with the September 2015 Transaction that was distinct from the injuries suffered by the shareholders generally – a fact that they (perhaps unwittingly) concede. The FAC states that, "The purchase price of the [September 2015 Transaction] was based on the value of the real estate that Singal, FCREI and [six entities under Singal's control] would be contributing to the REIT and its subsidiaries," and that Plaintiffs, therefore, did "not receive significant cash consideration in the transaction." (FAC ¶ 57.) To the extent the FC Defendants' alleged misrepresentations depressed the cash consideration Plaintiffs would have otherwise received had Defendants not promised to contribute certain properties to the REIT, that injury is "separate and distinct" from those endured by other REIT shareholders. It is perfectly apparent that the FAC alleges, ostensibly as a derivative claim, the very direct

claims that the JFURTI Plaintiffs settled and released as against all but one of the named
defendants in connection with the 2016 Settlement Agreement.

The one party as against whom Plaintiffs did not settle any direct claims arising out of the
2015 Transaction was DB. As noted above, Plaintiffs sued DB, and earlier this year, the Court
dismissed their complaint. The reason for the dismissal is highly significant: although Plaintiffs
purported to bring direct claims against DB, they pleaded those claims in such a manner as to
render them derivative claims rather than direct claims. The complaint against DB repeatedly
asserted that the failure by DB to contribute certain properties to the REIT, as originally
contemplated in the September 2015 Transaction, injured the REIT and its shareholders as a
whole. *See, e.g.*, Dkt. No. 17 Civ. 8945, Compl. ¶¶ 34 ("Downey's failure to record those eight
(8) deeds deprived First Capital REIT of the value of those assets as of September 15, 2015, and
caused First Capital REIT to have a lower assessed value than it otherwise should have . . ."); 35
("Downey's knowing misrepresentations contributed to the devaluation of the REIT's assets.");
40 ("The assets which were to have been transferred to the REIT pursuant to the Asset
Contribution Agreement in exchange for the sale of the United REIT and related entities were
never transferred and the deeds never recorded, which deprived the REIT of the value of those
assets and resulted in the REIT having a lower value than it should otherwise have had.").

In light of the fact that Plaintiffs chose to frame the injury allegedly caused by DB's
breach of contract as having been suffered by the REIT and its shareholders, the Court quite
properly dismissed that complaint. If the JFURTI Plaintiffs believed that the Court
misunderstood when it interpreted the claim asserted in the DB suit as essentially derivative in
nature, they had remedies – they could have sought reargument or taken an appeal from the
dismissal of their lawsuit. They did neither.

After nine lawsuits, Plaintiffs should have figured out by now that the way to get what they want – to obtain a ruling that the REIT is being looted and denuded of assets so as to render it unable to pay the $21,221,676.53 judgment – is to bring an action in New York state court, pursuant to N.Y. Debtor & Creditor Law ¶¶ 274–276, suing in their capacity as a judgment creditor who is seeking to set aside allegedly fraudulent transactions. But that is a direct claim by the JFURTI Plaintiffs – not a derivative claim that they may assert on behalf of the rest of their fellow shareholders.

Everything else, as they say, is beside the point.

## CONCLUSION

Defendants' motions to dismiss the FAC are GRANTED. The Clerk of Court is respectfully directed to close Dkt. Nos. 41 and 44.

Dated: November 12, 2018

_____

Chief Judge

TO ALL PARTIES BY ECF